Appellant was convicted of robbery and the jury fixed his punishment at 15 years in the penitentiary. He was arraigned in the presence of his retained counsel and interposed a plea of not guilty. After conviction and sentence appellant gave notice of appeal.
Omitting the formal parts the indictment reads as follows: *Page 1128 
 "The Grand Jury of said County charge that before the finding of this indictment Oliver Paul Summers, alias Paul Summers, alias Frank Summers, whose name to the Grand Jury is otherwise unknown, feloniously took, to-wit: Five Thousand Five Hundred Fifty Nine Dollars in lawful paper currency of the United States of America, the exact denominations of the bills being unknown to the Grand Jury, the property of Marjorie Cherry, from Joseph Cherry and Marjorie Cherry, against their will, by violence to their persons, or by putting them in such fear as unwillingly to part with the same, against the peace and dignity of the State of Alabama."
This case was tried on the evidence adduced by the State. Appellant did not testify nor did he offer any evidence in his behalf. When the State rested, appellant made a motion to exclude the State's evidence on the ground the State's case was based upon the uncorroborated testimony of accomplices. This motion was overruled and denied.
Mrs. Marjorie Cherry testified that she and her husband lived on the Kilpatrick Highway in Boaz, Alabama, and that she and her husband owned and operated the Sand Mountain Auto Auction located on Highway 431 near Boaz, Marshall County, Alabama. She stated they conducted an automobile auction every Wednesday and at times took in large sums of money. They had an auction on Wednesday, August 20, 1975, and she carried the proceeds from the auction sales to her home and hid the money in a clothes hamper in the bathroom and was going to make a bank deposit the next day.
Mrs. Cherry further testified that she and her husband were in their home on the evening of August 20, 1975. She stated that at approximately 7:30 p.m. she was in the kitchen and heard the doorbell ring. Her husband went to the door and she heard him say, "I'll get my wife." A few minutes later her husband walked in the kitchen followed by a man holding a pistol in his hand. The man with the pistol said, "This is a holdup. I am a professional; I'm not working alone. If you do exactly as I say, you'll not be hurt."
The man with the gun ordered Mr. and Mrs. Cherry to go into the bedroom and lie face down on the bed. Mrs. Cherry protested that she recently had surgery and could not lie face down and the man said, "That's all right, Mrs. Cherry, lie on your back." The man with the pistol ordered Mr. Cherry to lie face down on the bed and he told the man that he had a heart condition and the man told him to lie on his side. The man placed a pillow over Mrs. Cherry's face and a small rug over Mr. Cherry's face. He then taped their hands and ankles together.
Mrs. Cherry further stated that besides the man with the gun another man also entered the house and while the man with the gun stood guard over them, she heard the other robber going through the house opening doors and drawers. The robber with the gun kept asking, "Where is the safe?" Mrs. Cherry told him there was no safe in the house. The man then asked about their coin collection and Mrs. Cherry told him it was in the bank. The robbers found two shoe boxes full of coins in one of the closets and took them.
The robbers asked Mrs. Cherry where the money was and she told them she did not bring the money home that day but had given it to her brother to deposit. The man with the gun told her he did not believe that she had given the money to her brother to deposit and that the money was somewhere in the house. The bandit with the gun told Mr. Cherry, "If you don't make her tell me where the money is, I'm going to have to start working on you." Mr. Cherry told his wife to please tell the men where the money was and she told the robbers that the money was in the bathroom in the clothes hamper. The bandits found the money in the hamper. This money was the proceeds from the auction sale that day and the amount of it was $5,559.00.
The bandits then took Mr. Cherry's billfold and watch and they removed all the jewelry Mrs. Cherry was wearing. They also took a jewelry case containing watches, *Page 1129 
diamond rings, diamond pins, wedding band and other items of jewelry. The bandits were in the Cherry home a total of about 45 minutes and as they were leaving they took the keys to both automobiles but drove away in only one of the cars.
Mrs. Cherry further testified that she had a burglar alarm system installed in her house. She tried to activate the alarm system when she first saw the bandit with the pistol, but the system had been turned off earlier when Mr. Cherry had gone to the back porch. Mr. Cherry stated that in April, 1974, the telephone lines leading to the house had been cut, setting off the burglar alarm and at that time no burglary was committed.
Mrs. Cherry identified an envelope, marked State's Exhibit 1, containing seven items of jewelry as being a part of the jewelry the bandits took the night of the robbery at the same time they took the money aggregating $5,559.00. State's Exhibit 1 was admitted into evidence without objection. Mrs. Cherry specifically identified this jewelry as a yellow-gold pin with rhinestones and matching gold earrings, spiral earrings with pearls, a wedding band with a quarter carat solitaire and an engagement ring.
Donald Nissen testified that he had previously entered a plea of guilty to the robbery of Mr. and Mrs. Cherry and had received a sentence of 15 years.
Nissen testified that the robbery had been planned at the home of the defendant Paul Summers in Clanton, Alabama. Nissen testified that present at the time were Danny McClellan, Danny Register and Bull Poe. Nissen testified that Danny McClellan is presently doing a natural life sentence in the Florida State Penitentiary. He testified that Bull Poe is currently serving two life sentences in Alabama. And he said that Danny Register is currently in jail waiting to go to the penitentiary. Nissen testified that the discussion concerning robbing the Cherrys took place approximately six weeks to two months before the robbery occurred.
At this meeting at Summers's house, Summers told the group that he had been up to the Cherrys' house in Marshall County and "looked at it with the intention of burglarizing the house to rob a safe with someone else." Summers said that due to the fact there was a burglar alarm on the house they were not able to enter the house and that he wanted the group to go up there and look at the house with him with the thought of robbing Mrs. Cherry at gunpoint. Summers said that there would be no one there but Mrs. Cherry herself.
A few days after this meeting Nissen, Poe, Register, McClellan and the defendant Summers drove to Boaz to rob Mrs. Cherry. When they arrived they found that Mrs. Cherry had remarried and, because they were uncertain as to who her new husband was, and how many people might now be living in the house, plans to rob the house and its inhabitants were postponed.
Nissen testified that some five or six weeks later in August of 1975 a group consisting of himself, Danny McClellan, Bull Poe, Paul Summers, Jimmy Thomas and Rusty Zinghan left for Boaz from the defendant's car lot in Clanton early in the morning. McClellan, Poe and Summers were traveling in Summers's Lincoln Continental. Zinghan, Thomas and Nissen were traveling in a black 1965 Oldsmobile which they got from the defendant Summers's car lot in Clanton.
On the way to Boaz they stopped just south of Birmingham in the town of Hoover and robbed a family in that community around midmorning. Following this robbery the group traveled to Boaz and arrived there approximately two hours before dusk.
The group assembled in the Holiday Inn parking lot in Boaz and traveled in one car to the Cherrys' house. The house was pointed out to the group by the defendant Summers. They all then returned to the Holiday Inn. At that time Zinghan, Thomas and Nissen got in the black 1965 Oldsmobile and drove around waiting for nightfall. McClellan, Poe and Summers waited behind for them at the Holiday Inn in Summers's Lincoln Continental. *Page 1130 
After nightfall Nissen, Zinghan and Thomas drove to the Cherry residence and Nissen and Thomas went to the front door. Zinghan waited in the car. After gaining entrance to the house on the ruse that they had some cars to sell, Nissen and Thomas proceeded to tie up and rob Mr. and Mrs. Cherry.
After entering the house Nissen returned to the front door and notified Zinghan, who was waiting outside in the car, to leave. Following the robbery Nissen and Thomas left in one of the Cherrys' cars. They drove to the Holiday Inn parking lot where they met McClellan, Poe and the defendant Summers.
Nissen had a suitcase he had taken from the Cherrys' house in which he had placed the guns used in the robbery and the money and jewelry obtained during the robbery he put in an attache case. Nissen gave this suitcase and the other case to Paul Summers. Summers took both cases and threw them in the back of his Lincoln Continental. After hiding the Cherrys' Oldsmobile in a field, Nissen, Zinghan, Thomas and Poe met with McClellan and the defendant Summers at a truck stop. At that time McClellan counted out $500 each from the proceeds of the robbery to Thomas and Zinghan. Following this, Poe and Nissen took Zinghan and Thomas to Birmingham where Zinghan and Thomas boarded a plane to Tampa, Florida.
After dropping off Zinghan and Thomas at the airport in Birmingham, Nissen and Poe drove to Clanton where they met Summers and McClellan at Summers's car lot. There they parked the 1965 black Oldsmobile that they had used in the robbery back in the car lot and removed the license plates that had been used in the robbery from it.
The four, Nissen, Poe, McClellan and Summers, then went inside the office of the car lot and divided up the money and jewelry that had been taken in the robbery. Nissen testified that Summers's share of the money taken in the robbery was approximately eight or nine hundred dollars. All of the silver coins taken from the robbery were left at the office of Summers's car lot. Summers was supposed to take the silver coins and "turn them into cash." Part of the jewelry was taken by Danny McClellan and the rest was left in Clanton with the defendant. Nissen got a Longine watch for part of his share of the jewelry.
Nissen then identified several items of jewelry that had been taken in the robbery and previously identified by Mrs. Cherry.
Nissen testified that the defendant Summers had provided the license plates that were placed on the automobiles used in the robbery.
On cross-examination Nissen testified that he had also pled guilty to two second-degree burglary charges in Houston County, Alabama and received a 15 year sentence, concurrent with the 15 years he received in the Cherry robbery. Nissen testified that he had an agreement with the State of Alabama whereby he was to receive a total of 15 years imprisonment for the commission of some six robberies and two burglaries.
On redirect Nissen testified that Summers came along on the trip to Boaz "in case we had to open a safe, to open the safe for us at the first place that we had robbed that day," (the robbery that had occurred in Hoover earlier on the same day as the Cherry robbery). Summers had brought along safe cracking tools on the trip.
Elaine McClellan testified that her husband, Danny McClellan, is presently serving a life sentence in the State of Florida.
Mrs. McClellan identified several items of jewelry that had been previously identified as coming from the Cherry robbery. She testified that she first saw the items of jewelry at the defendant Summers's car lot in Clanton in late August or early September of 1975. She testified that she and her husband Danny McClellan had driven up to the defendant's car lot from their home in Dothan.
When they arrived at the car lot they were met by the defendant Paul Summers. The three of them went into the office at Paul Summers's car lot. Upon entering the office her husband, Danny and the defendant *Page 1131 
Summers went into a side office. Shortly afterward they returned. As they returned she saw the defendant Summers handing to her husband a small white box. At the time she saw Summers hand the box to her husband she heard Summers say, "This is the rest of the jewelry from the score off the mountain." She also heard Summers say that the jewelry came from the lady who owned the auction in Boaz.
Later, on the way back to Dothan in the car she looked into the box and saw the items of jewelry which she had previously identified and two wristwatches — a man's and a woman's. The man's wristwatch was given by her husband to her younger brother and the woman's wristwatch was pawned in a pawnshop in Tampa, Florida. The rest of the jewelry remained at her house until the investigation into this case began and was turned over by her to Lieutenant Stokes of the Dothan Police Department.
Mrs. McClellan also testified that during the time she and her husband were at the defendant's car lot in Clanton she heard Summers complaining to her husband "that Don (Nissen) had held out some things off the mountain." Summers also said at the time that it wasn't the first time that Nissen had "held out some things from a score that I had set up."
Mrs. McClellan also testified that Summers was complaining at the time to her husband about Don (Nissen) and Jimmy (Thomas) having screwed up a job in Columbiana the same day.
The witness also testified that a few months preceding the trial she received a telephone call from the defendant Summers at her residence in Dothan. During the conversation the defendant asked her if she had "heard about Wormy (Donald Nissen) being picked up in the blue Mark IV" in Florida. Summers also said that he Summers, had heard that "Don (Nissen) and Danny (McClellan) had gotten together and talked to the big men." Mrs. McClellan testified that Summers also told her that if Bull (Poe) had done the job right that he would "not be where he is at today." Summers also said that he was having to send money to Poe to keep his mouth shut.
Mrs. McClellan also testified that just a few weeks prior to the trial she received another telephone call from the defendant Summers at her home in Dothan. During the conversation Summers asked her if she was going to be a State's witness in the case against him. She testified that he said, "I don't hurt women or anything, but are you a State's witness?"
On cross-examination Elaine McClellan testified that she had worn some of the stolen jewelry she had previously identified prior to turning it over to the Dothan Police Department. She stated that she turned the jewelry over to Lieutenant Stokes of the Dothan Police Department when she learned that Donald Nissen had been arrested. She testified that no case was currently pending against her for buying, receiving or concealing stolen property. She testified that she did not have a felony record.
Mrs. McClellan testified that the life sentence her husband Danny McClellan was serving in Florida was a natural life sentence for a murder committed during the course of a robbery. She stated that McClellan would not be eligible for parole for 25 years.
Following the testimony of Elaine Campbell McClellan it was stipulated by the attorneys for the State and for the defense that the case had been brought in the proper venue.
Appellant contends that the indictment in this case is void and would not support the judgment of conviction. We do not agree.
This Court has held many times that there are three essential elements of the crime of robbery. They are: (1) felonious intent, (2) force, or putting in fear as a means of effecting the intent, and (3) by that means of taking and carrying away of the property of another from his person or in his presence, all of these elements concurring in point of time. Tarver v.State, 53 Ala. App. 661, 303 So.2d 161; Crutcher v. State,55 Ala. App. 469, 316 So.2d 716. *Page 1132 
The constitutional right of an accused to demand the nature and cause of the accusation against him is not a technical right, but is fundamental and essential to the guaranty that no person shall be deprived of his liberty except by due process of law, nor be twice put in jeopardy for the same offense.
An indictment should be specific in its averments in four prime aspects to insure this guaranty: (a) to identify the accusation lest the accused should be tried for an offense different from that intended by the grand jury; (b) to enable the defendant to prepare for his defense; (c) that the judgment may inure to his subsequent protection and foreclose the possibility of being twice put in jeopardy for the same offense, and (d) to enable the Court, after conviction, to pronounce judgment on the record.
The indictment in this case practically tracks the form prescribed by the statute for the offense of robbery. Title 15, Section 259, form 95, Code of Alabama 1940.
Appellant claims that the indictment does not sufficiently charge the offense of robbery because it does not contain the formal wording "from the person of or in the presence of" in referring to the taking of the property from the victims.
In Hardis v. State, 28 Ala. App. 524, 189 So. 216, was held good an indictment charging the defendant with "having feloniously taken one automobile truck of the value of $500, and meal of the value of $10, all of the aggregate value of $510, the property of I.N. Stewart, from his person, and against his will, by violence to his person, or by putting him in such fear as unwillingly to part with the same." It will be noted that the words "in the presence of" were omitted from the indictment in Hardis, supra.
Title 15, Section 232, Code of Alabama 1940, provides, in pertinent part, that an "indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment; . ."
The indictment in this case is couched in language so clear that any person of common understanding would know that the crime of robbery was charged against appellant.
Cases in other jurisdiction which have considered this same issue clearly hold that the words "from the person of or in the presence of" are not necessary in an indictment for robbery as long as it can be reasonably inferred that the property in question was taken from the person of, or under the control of, the victim of the robbery. See Salzer v. Maxwell, 173 Ohio St. 573, 184 N.E.2d 396; People v. Franklin, 22 Ill. App.3d 775,317 N.E.2d 611; State v. Oliver, 32 Ohio St.2d 109, 290 N.E.2d 828;People v. Williams, 403 Ill. 248, 85 N.E.2d 828; Smyth v.White, 195 Va. 169, 77 S.E.2d 454.
In Salzer v. Maxwell, supra, the appellant complained that the indictment did not contain the words "from the person of" and contended that the omission of those words rendered the indictment defective in not alleging an essential element of the crime.
The Ohio Supreme Court specifically upheld the indictment saying:
 "All of the provisions of the statute were contained therein except the phrase, `from the person of' and, when the allegation, `did steal' from Chester Schubert, is read in conjunction with the remainder of the indictment, it is clear that the currency was taken from the person of, or that the currency was under his immediate control at the time of the theft."
Appellant appeared along with his retained counsel at his arraignment approximately one month prior to the date of his trial. At his arraignment appellant received, read and signed a printed copy of his legal rights in the presence of his attorney. This document informed appellant that he was charged with the offense of robbery, and explained the minimum and maximum sentences to him and his legal *Page 1133 
rights. There was a colloquy between the Court and appellant during the arraignment proceedings in which appellant informed the Court that he had read and understood his legal rights contained in the printed document and that it was not necessary for the Court to explain his rights in more detail. At appellant's arraignment the Court expressly told appellant, "The Grand Jury of this County has returned an indictment against you; that indictment charges you with robbery." The indictment was read to appellant in the presence of his attorney and a not guilty plea was entered at that time.
Although appellant was given more than two weeks after his arraignment to file any pleas or motions, no demurrer to the indictment or any motions challenging the sufficiency of the indictment were ever filed by appellant. At the time appellant made a motion to exclude the State's evidence he did not question the sufficiency of the indictment in any form or fashion. The sufficiency of the indictment was raised for the first time on this appeal.
We hold the indictment is sufficient to support the judgment of conviction.
Appellant contends that the trial court committed reversible error in denying his motion to exclude the State's evidence. The basis of this motion was that Mrs. McClellan was an accomplice in the robbery and there was no legal evidence to corroborate the testimony of Donald Nissen who was an admitted accomplice. The trial court charged the jury that Nissen was an accomplice as a matter of law and that the jury could not convict appellant on the uncorroborated testimony of Nissen. The Court further charged the jury that after considering all of the evidence in this case, "you determine that Elaine Campbell McClellan, that particular witness, was also an accomplice then you cannot convict the defendant in this case."
The testimony of Mrs. McClellan shows beyond any question that she was not an accomplice in the robbery of Mr. and Mrs. Cherry. She testified that she had seen appellant in his office hand a small white box to her common-law husband, Danny McClellan, and heard him state to her husband, "This is the rest of the jewelry from the score off the mountain." After leaving appellant's place with her husband she opened the box and found jewelry in it. She wore the jewelry for six to nine months, knowing it was stolen, but without ever knowing from whom it had been stolen. She heard appellant say that the jewelry came from the lady who owned the auction in Boaz, but she did not know the name of that lady. It is clear that Mrs. McClellan had no prior knowledge of the robbery of Mr. and Mrs. Cherry and had no knowledge where the stolen jewelry had come from other than hearing what appellant told her husband at the time appellant gave the box to her husband.
The following cases demonstrate that Mrs. McClellan was not an accomplice in the robbery of Mr. and Mrs. Cherry: Childs v.State, 43 Ala. App. 529, 194 So.2d 861; Dye v. State,25 Ala. App. 138, 142 So. 111; Belser v. State, 16 Ala. App. 504,79 So. 265.
The testimony of Mrs. McClellan was more than ample and sufficient legal corroboration of the testimony of Donald Nissen, an admitted accomplice.
Next appellant contends that the trial court committed reversible error in allowing testimony concerning the robbery in the Hoover-Columbiana area on the same day and date and by the same parties who robbed the Cherrys at Boaz, Alabama.
In Jackson v. State, 229 Ala. 48, 155 So. 581, the Supreme Court held:
 "Evidence of other and distinct criminal offenses, at other times and places, is admitted in evidence only in exceptional cases and for limited purposes. Among these are cases where such evidence may throw light on the motive, intent, scienter, or identity, and so tend to establish the guilt of the party of the offense for which he is being tried. The details of such other crimes are not admissible, except in so far as essential to disclose the motive or other matter for which it is admitted. Gassenheimer v. State, 52 Ala. 313 *Page 1134 
; Ingram v. State, 39 Ala. 247, 84 Am.Dec. 782; Moore v. State, 10 Ala. App. 179, 64 So. 520; Davis v. State, 213 Ala. 541, 105 So. 677.
 "But this case is governed by another and different principle. Everything constituting the one continuous transaction is admissible as of the res gestae. No matter how many distinct crimes may be involved, all the details of the one continuous criminal occurrence or adventure may be considered by the jury in passing upon the culpability, the wickedness, and depravity of the crime for which the party is being tried. In cases of robbery the jury is given a wide range of discretion in fixing the punishment. They may look to all the circumstances constituting part of the res gestae in meting out punishment within the limits prescribed by law. It follows all these circumstances are the subject of legitimate argument on the part of the solicitor. Ingram v. State, supra; Kennedy v. State, 182 Ala. 10, 62 So. 49; Smith v. State, 88 Ala. 73, 7 So. 52; 16 C.J. Section 1115."
The case of Lowe v. State, 134 Ala. 154, 32 So. 273, dealt with the prosecution for larceny of 18 head of cattle from a farm in Macon County. While the defendants were driving away with the 18 head of cattle they stopped and picked up a bull that belonged to another person and carried the cattle and the bull to Montgomery. The Supreme Court held that everything that happened on the drive from the first farm to the second farm and then on to Montgomery was part of the same transaction and admissible against the defendants.
In Parsons v. State, 251 Ala. 467, 38 So.2d 209, the defendant was tried for robbing a man at his home, of a set of car keys. The State was permitted to prove, over objections, that the automobile to which the keys belonged was then used by the thief in committing a burglary. The Supreme Court said:
 "But the rule is that if several crimes in fact constitute one criminal transaction, evidence of all such crimes may be given as part of the res gestae of the offense with which defendant is charged."
Numerous cases to the same effect are collected in Ala.Dig.Crim.Law 365 (1).
We hold that evidence of the robbery in the Hoover-Columbiana area which was committed by the same parties and on the same day and date as the robbery of Mr. and Mrs. Cherry at Boaz was properly admissible as of the res gestae and constituted one continuous criminal occurrence or adventure.
Finally appellant contends that the prosecuting attorneys committed reversible error during their closing arguments to the jury wherein the prosecutors referred to appellant as (1) a "safe specialist"; (2) asked the jury to "put the defendant out of circulation for a substantial time to make sure that he will have reached the age of maturity by the time he walks the streets again, and that he will be mature enough not to go back on the job of setting up robberies all over the state"; and (3) because the prosecuting attorney charged the defendant with threatening a witness for the State.
It is settled law that counsel both for the State and the defendant are allowed wide latitude in drawing their deductions from the evidence in argument to the jury. Johnson v. State, Ala.Cr.App., 335 So.2d 663; Colston v. State, Ala.Cr.App.,325 So.2d 520; Edson v. State, 53 Ala. App. 460, 301 So.2d 226.
 In Edson v. State, supra, this Court said: "Every fact the testimony tends to prove, every inference counsel may think arises out of the testimony, the credibility of the witnesses, as shown by their manner, the reasonableness of their story, their intelligence, means of knowledge, and many other considerations, are legitimate subjects of criticism and discussion. So, the conduct of the accused, his conversation (if in evidence), may be made the predicate of inferences, favorable or unfavorable."
In Johnson v. State, supra, it was recognized that "comments, even though hard hitting, which may arise from reasonable inferences from the evidence are permissible." *Page 1135 
In Colston v. State, supra, this Court held:
 "There is no legal standard by which the prejudicial qualities of improper remarks of a District Attorney in the trial of a case can be gauged. Each case must be determined on its own merits."
In Edson v. State, supra, we further observed:
 "It is both the duty and the right of counsel to present the case of his client, whether it be the State or a defendant, as fully and forcibly as the evidence, its tendencies and the inferences therefrom may justify. Within these limits, the widest range of discussion should be accorded."
 "The rule in this State is well established and has often been cited. It is as follows: `The statement must be made as a fact; the fact stated must be unsupported by any evidence, must be pertinent to the issue or its natural tendency must be to influence the finding of the jury . ." (Emphasis in the original).
The evidence adduced was crystal clear that on the day in question, the appellant and five associates left from appellant's car lot in Clanton, Alabama, for the express purpose of committing two robberies that same day — one in the Hoover-Columbiana area south of Birmingham and the other in Boaz, Alabama, at the home of Mr. and Mrs. Joseph Cherry. The evidence showed that in addition to providing the information concerning the places to be robbed the appellant furnished the vehicles with false license plates to be used as transportation to the designated places. Appellant went along with a set of burglary tools or safe cracking tools, to open safes in the event his services were needed or required.
In the light of this evidence reference to appellant as a "safe specialist" was a legitimate inference to be drawn by the prosecuting attorney in his argument to the jury.
For analogous authorities see the cases of Jeter v. State, Ala.Cr.App., 339 So.2d 91, a worthless check case where the prosecutor referred to the defendant as a "flim flam artist", and Matthews v. State, 42 Ala. App. 406, 166 So.2d 883, a stolen property case where the prosecutor referred to the defendant as a "fence." This Court held that the argument of the prosecutor in both of these cases "falls in the scope of proper argument as being a reasonable inference from the evidence as presented."
With reference to the argument of the prosecuting attorney in requesting the jury to put appellant out of circulation for a substantial time to keep him from setting up robberies all over this State we think this argument was no more than an appeal to the jury to convict appellant and, thus, protect society from the commission of similar crimes. Witt v. State, 27 Ala. App. 409,174 So. 794; Hawes v. State, 48 Ala. App. 565,266 So.2d 652; Barnett v. State, 52 Ala. App. 260, 291 So.2d 353.
It can be fairly said that the testimony showed that appellant "set up", conceived, planned and participated in the robbery of the Cherrys' home in Boaz. Added to this is the testimony of Mrs. McClellan that appellant said that it "wasn't the first time that Nissen held out some things from a score that I had set up."
The argument with reference to appellant threatening a State witness is fully supported by the record. Mrs. McClellan testified that appellant called her on the telephone and stated, "I don't hurt women or anything, but are you a State's witness?" The clear implication of this testimony was a warning to Mrs. McClellan that she would be in danger if she showed up at appellant's trial and testified against him. This was a proper subject of comment by the prosecutor.
Appellant filed interrogatories to two witnesses who were either in jail in Alabama or in prison in Florida. These interrogatories were filed the day before appellant moved for a continuance so that these witnesses would have time to answer these interrogatories. There was absolutely no showing what the testimony of these witnesses would be. The trial court did not abuse his discretion in denying appellant's *Page 1136 
request for a continuance under the circumstances of this case.Brown v. State, 247 Ala. 288, 24 So.2d 223; Sparks v. State,46 Ala. App. 357, 242 So.2d 403.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.