Appellant was convicted of robbery and the jury fixed his punishment at ninety-nine years in the penitentiary. Appellant was indigent and the Court appointed members of the Public Defender's Office. At arraignment, in the presence of appointed counsel he pleaded not guilty. After sentence was imposed, he gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent him on appeal.
The evidence in this case consisted solely of that introduced by the State. Appellant did not testify, nor did he offer any evidence in his behalf.
Appellant was put to trial upon a five-count indictment charging, inter alia, robbery, assault with intent to murder the security guard, assault with intent to murder the manager of the grocery store where the robbery occurred, and assault upon a police officer with a deadly weapon while such officer was engaged in the active discharge of his lawful duties. At the close of the State's case the prosecution dismissed all counts in the indictment except the two robbery counts.
Omitting the formal parts the two counts submitted to the jury are as follows: *Page 392 
 "I. The Grand Jury of said county charge that before the finding of this indictment Charles Moseley, alias Charles Mosely, alias William Napier, alias Charlamagna Moseley, alias Melvin Mosley, alias Calvin T. Holder, alias Milton George Moseley, alias Charles Mange Mosley, whose name is otherwise unknown to the Grand Jury, feloniously took and carried away one (1) Colt brand Python .357 Magnum pistol, a better description of which is unknown to the Grand Jury, of the value of, to-wit: Three Hundred Twenty-five and no/100 ($325.00) Dollars, the property of Bank Sims from his person, or in his presence, and against his will by violence to his person or by putting him in such fear as unwillingly to part with the same,
 "IV. The Grand Jury of said County further charge that before the finding of this Indictment, Charles Moseley, alias Charles Mosely, alias William Napier, alias Charlemagna Moseley, alias Melvin Mosley, alias Calvin T. Holder, alias Milton George Moseley, alias Charles Mange Mosley, whose name is otherwise unknown to the Grand Jury, feloniously took and carried away a sum of money, to-wit: Four Hundred Forty Six and no/100 ($446.00) Dollars, lawful cash, currency or coin of the United States of America, a better description of which is unknown to the Grand Jury, the property of Warehouse Grocery of Tuscaloosa, Inc., a corporation, but in the lawful possession of Randall L. Russell, from his person or in his presence, and against his will by violence to his person or by putting him in such fear as unwillingly to part with the same, against the peace and dignity of the State of Alabama."
Mrs. Glenda Blaich testified that on the night of February 16, 1977, she, her husband and their two children, a boy three years old and a girl two years of age, drove to the Warehouse Groceries to shop around 9 o'clock. She and her daughter waited in the car while her husband and son went inside the store.
Mrs. Blaich noticed a vehicle drive up. There were three black males in the car. All three got out of that car and entered the store. Two of them were wearing long dark coats and the third was wearing a short dark coat. Mrs. Blaich further testified that she attended a lineup on February 28, 1977. She stated she did not identify appellant. After these men entered the store, Mrs. Blaich heard sounds "like fire-crackers." She looked into the store and saw a black man wearing a long coat standing at the manager's desk. There "was a commotion going on," Mrs. Blaich testified. Thereafter, Mrs. Blaich heard screams, and saw the three men run from the store.
Allen Blaich testified that he, his wife Glenda, and his two children went to Warehouse Groceries on the night of February 16, 1977. He stated that they arrived at the store at 9 o'clock. While he and his son were in the store, Blaich heard gunshots. He looked towards the manager's office and saw a black man "scuffling" with the night manager. Blaich then heard another gunshot. The manager ducked down in the office. Then Blaich saw the black man jump up on the check cashing counter on his knees and shoot down into the manager's office. The manager kicked open the office door and ran out. The black man then fired at the manager again. Blaich testified that, while he was inside the store, he saw a uniformed police officer.
Randall Russell testified that he was night manager for Warehouse Groceries on February 16, 1977. Approximately 9:15 that night, Russell was working in the office. While he was counting money from one of the store's registers, Russell was shot in the arm and shoulder. Russell turned and saw a gun pointed at his face. He grabbed the weapon, turning it away from him. Russell struck his assailant, ducked down and kicked open the office door. Another gunshot grazed his back. Then Russell ran down an aisle in the store. As he ran he felt another bullet whiz by. Russell subsequently returned to the office and pushed the alarm button. The money from the register was gone. Russell did not identify appellant as being in the store that night. His assailant was another man. *Page 393 
Carol Henderson testified that on February 16, 1977, she was head cashier at Warehouse Groceries. She worked the 7:00 a.m. to 3:00 p.m. shift. One of her duties was verifying the amounts of cash in the registers at the store. Ms. Henderson ran a check on February 17, 1977 of the register till Russell had been counting at the time he was shot. She found a shortage of $466.92. She stated that this money, which was missing, was the property of Warehouse Groceries.
Phyllis Davis testified that she was employed as a cashier at Warehouse Groceries on February 16, 1977. On that night, Davis saw Randall Russell "read down" a cash register and take the till from that register to the office. Shortly thereafter, she heard two gunshots and turned towards the office. She saw Russell leaning over the customer window of the office. There was blood on his shirt. She then ducked underneath the counter. She testified that, "When I stuck my head out from under the counter, I heard someone just say to me, get back where you were and stay on the floor, and I looked up and there stood a black man." This man was holding a gun. Subsequently, she saw two men leave the store. She saw an empty register till in the office and called the police.
George Whitley testified that he was shopping at Warehouse Groceries on the night of February 16, 1977. As he was standing at the check-out counter Whitley saw a black male fire a pistol at the night manager. Another black male was standing nearby. He had a small .25 caliber pistol. This man told Whitley not to move. Whitley leaned down over his eleven year old daughter, and then heard two more gunshots. Everything got quiet, Whitley testified, and then there was a gunshot outside. Whitley stated that the two men he saw were wearing long dark coats and toboggan hats.
Pat Bush testified that she and Brenda Faye Jones went shopping at Warehouse Groceries on the night of February 16, 1977. She noticed two men in the store wearing long dark coats. Subsequently, when Pat Bush was ready to check out, she saw a police officer and appellant, one of the men she had noticed earlier. At that time she heard what sounded like firecrackers. This sound came from the manager's office. Ms. Bush saw the manager struggling with a man who had a gun. Then she heard another "bang" from the rear of the store. She turned and saw appellant holding a gun and standing over the police officer who was lying on the floor.
Brenda Faye Jones testified that she was shopping with Pat Bush on the evening of February 16, 1977, at Warehouse Groceries. She noticed two men wearing big coats back at the meat counter. Subsequently, Ms. Jones saw appellant walking down an aisle with a police officer. When Jones and Bush were moving toward the check-out counter, Jones heard "firecrackers." She saw appellant holding a gun, standing over the police officer.
Banks Allen Sims testified that he was a police officer for the City of Tuscaloosa. He also stated that he was employed as a security guard for Warehouse Groceries on the night of February 16, 1977. Sims was standing in the front of the store when he was approached by appellant. Appellant asked Sims, "Could you help me a minute." Sims told appellant he would, and followed appellant around some shelves of soft drinks. From that place, Sims could not see the manager's office.
Appellant asked Sims if he knew how much the drinks were. At that time Sims heard a gunshot. He immediately turned, drew his service revolver and ran towards the front of the store. Sims testified, ". . . I heard a shot and I went down."
From the record:
 "A. I fell face down on my left side with my left arm under me, and I couldn't get my left arm out from under me, I looked up and I still had my service revolver in my right hand, I pulled my right hand down by my side. I began to push myself up and I heard somebody — first I felt a metal object, it felt like a gun placed at the back of my head, and I heard what sounded like a colored male's *Page 394 
voice saying, Lay it down or turn it loose, I believe he said, Turn it loose, the best I can remember, and I did at this time.
"Q. That was your gun?
"A. Yes, it was.
"Q. All right.
 "A. That's about all I can tell you except that other than the fact that he took my gun, I didn't see him anymore after that."
Glenda Blaich was then recalled. She testified she saw the same three men exit the store. She stopped a boy, Jack Alexander, who was walking by her car, and told him that the store was being robbed. Alexander crouched down by Mrs. Blaich's car. When the three men came out of the store, one of them approached Mrs. Blaich's car. He put a gun to Alexander's head and demanded that he give him his money. Alexander dropped his wallet into a bag the man was carrying. Then a gunshot pierced the windshield, narrowly missing Mrs. Blaich.
Jack Alexander testified that he went to shop at Warehouse Groceries on the evening of February 16, 1977. Alexander parked his car in the store lot and began to walk towards the store. Mrs. Blaich warned him not to go into the store. Alexander saw the three black men try to get out the entrance doors but they could not. Then he saw them run to the exit doors and leave the store and come in his direction. One raised a gun and said, "You better get down, you mother." Another man "stuck" a gun in Alexander's face and demanded Alexander's wallet. Alexander further testified that these three men were black and wore dark clothing. Then a gunshot broke the windshield and passed over Mrs. Blaich's head, Alexander testified. He identified appellant as one of the men who stood by while he was robbed.
Donald Guy testified that he was in Warehouse Groceries around 9 o'clock on the evening of February 16, 1977. He saw a black man shooting a gun in the office and then taking money from the till. Guy ran to a nearby Pizza Hut and had the police called. He then flagged down an off-duty policeman.
Allen Fondren testified that on February 16, 1977, he was an investigator for the Tuscaloosa Police Department. He was also employed as a security guard at Gayfer's. Fondren got off work at Gayfer's at 9:15 p.m. that night. He stopped a vehicle at Pizza Hut for a license check. Shortly thereafter, Fondren saw a white male running from the Pizza Hut, waving and shouting. Fondren then heard a shot from the direction of Warehouse Groceries. Then Fondren blocked the road leading from the parking lot, when he saw a car leaving the lot at a high rate of speed. This car ran off the lot into a ditch.
Fondren handcuffed three men who were in the car. One of these was appellant. Out of the presence of the jury, Fondren testified that he saw a snub-nosed .357 caliber revolver in the car when he got the two passengers out of the car. When he walked to the driver's side of the car, he saw a blue steel revolver lying on the ground by the car door. The snub-nosed revolver was loaded and cocked. Fondren also recovered a brown paper bag, a small caliber automatic pistol and a black leather holster. The automatic, the snub nose, the holster and the bag were taken from the car after Fondren had received a radio dispatch that Warehouse Groceries had been robbed. Appellant moved to suppress the evidence taken from the car on the ground that the search was illegal. The trial judge overruled this motion.
When the jury returned, Fondren testified to what evidence had been taken from the car in the ditch. Shortly after the three men were handcuffed, Officers McFerrin and Toxey of the Tuscaloosa Police Department arrived on the scene. Fondren testified that he turned the automatic, the snub nose, and the blue steel pistols over to Jim Brittain, the State Toxicologist.
Fondren testified that appellant was "patted down" on the scene by Officer Toxey. Toxey turned another weapon over to Fondren then. The gun belonged to Banks Sims. Fondren testified that the brown *Page 395 
bag contained $466.00. The money was turned over to Police Captain Billy Tinsley. The bag also contained a wallet belonging to Jack Alexander.
George Toxey testified that he was a police officer for the City of Tuscaloosa. He stated that he responded to a call concerning a robbery at Warehouse Groceries. When he arrived on the scene he searched the three handcuffed men. He found a nickel plated Colt Python revolver with a four-inch barrel on the appellant. It was loaded. Toxey stated that he turned this weapon over to Fondren.
Billy Tinsley testified that he was a Captain in the Tuscaloosa Police Department. He received from Fondren a brown bag containing $466.00.
Joe Thrower testified that he was a police officer for the City of Tuscaloosa. He stated that he was present on the evening of February 16, 1977 when appellant was searched by Officers Toxey and McFerrin. Thrower further testified that seven rounds of .357 caliber ammunition were removed from the clothing of appellant.
James C. Brittain, III, testified that he was a Toxicologist for the Alabama Department of Toxicology and Criminal Investigation. On the evening of February 16, 1977, he received evidence involved in a robbery of Warehouse Groceries. Brittain received four firearms from Fondren at the officer's office. These were: a Colt Python model 357 magnum caliber 6-shot double action revolver with a six-inch barrel, which had been fired twice; a .25 caliber Baretta semi-automatic pistol; a Colt brand Lawman, MK3 357 magnum caliber, six shot, double action revolver with a two and a half inch barrel, which had been fired three times, and a Colt brand Python model six-shot double action revolver with a four inch barrel which had not been fired.
After the presentation of the State's case, appellant moved to exclude the State's evidence in that a prima facie case was not established and that a variance existed between the allegations of the indictment and the proof adduced at trial.
Appellant contends that the trial court erroneously admitted evidence of a separate and distinct offense, the robbery of Jack Alexander. He argues that such evidence was not admissible as a part of the res gestae, citing McElroy's Alabama Evidence, Third Edition (1977), Section 69 (3). That section states in part that evidence of another crime is part of the res gestae if it is inseparably connected with or part of the crime charged.
Appellant here points out that the robbery of Jack Alexander occurred a few moments after the incident in the store, in a different location, and concerned a different victim.
The trial court did not err in allowing evidence of the robbery of Jack Alexander. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which defendant is charged. Summers v. State, Ala.Cr.App.,348 So.2d 1126; cert. denied 348 So.2d 1136. Also see numerous cases cited in Alabama Digest, Criminal Law Key Number 365 (1).
We hold that evidence of the robbery of Jack Alexander, committed only moments after the robbery in the store, in the store's parking lot, by the same parties was admissible as part of the res gestae of a continuous criminal adventure.
Appellant next argues that the trial court erroneously overruled appellant's motion to exclude the State's evidence on the ground that there was a variance between the indictment and the proof at trial.
At trial Randall Russell and Carol Henderson both testified that the money was the property of Warehouse Groceries, Inc.
To support his contention of error, appellant cites Gray v.State, Ala.Cr.App., 346 So.2d 974. There defendant was convicted of grand larceny for the theft of $200.00 from a narcotics agent. The indictment alleged that this money was the property of the City of Huntsville. No proof of this fact was offered at that trial. *Page 396 
The Court wrote:
 "The indictment alleged in specific terms that the $200.00 taken from Officer William Harris at gunpoint was the personal property of the City of Huntsville, a municipal corporation. There is not one thread, glimmer or scintilla of evidence of the entire record to show that Officer Harris had any connection with the City of Huntsville as agent, servant or employee, or that any official of the City of Huntsville ever turned over to Harris any money in the performance of his duties as an undercover agent. There was no evidence that he ever had custody of any money belonging to the City of Huntsville as agent, bailee or otherwise."
 * * * * * * "[4] It was the wholly unnecessary to have alleged in the indictment that the money taken was the personal property of the City of Huntsville. Having done so it was incumbent upon the State to prove this allegation. Harris v. State, 44 Ala. App. 449, 212 So.2d 695."
The case at bar is distinguishable. A variance between the indictment and proof as to ownership in a robbery case is immaterial so long as the offense is described with sufficient certainty to identify the act of robbery and to establish that the property was in the immediate actual possession of the person robbed. Oliver v. State, 55 Ala. App. 192, 314 So.2d 111. In an indictment for robbery, the ownership of property is properly laid in the party who has possession, either as owner, bailee or agent. Mays v. State, Ala.Cr.App., 335 So.2d 246.
Here the evidence was sufficient to support the conviction of appellant. The essential elements of the offense of robbery are: felonious intent; force or putting in fear as a means of affecting the intent; and by that means, taking and carrying away the property of another from his person or in his presence, all of these elements concurring in point of time.Summers v. State, supra; Lee v. State, Ala.Cr.App.,346 So.2d 31.
Two eyewitnesses testified that appellant accompanied the two other men who robbed the grocery store. They both testified that he stood with a gun over the wounded police officer in the store. He was identified by Jack Alexander as being present when he was robbed. Finally, a search of appellant revealed that he was in possession of Banks Sims' police revolver.
The trial court did not err in denying appellant's motion to suppress the evidence recovered by police at the scene. Fondren reasonably investigated the occupants of the car which ran into the ditch. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868,20 L.Ed.2d 889. The weapons which Fondren saw were in plain view. At that time Fondren radioed police headquarters and was informed that Warehouse Groceries had been robbed. This gave Fondren probable cause to carry out a full search of the car and the occupants since exigent circumstances were present. Chambers v. Maroney,399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419.
There was more than ample evidence to support the verdict of the jury and the judgment rendered thereon. Appellant was positively identified by Officer Banks Sims and by Patricia Bush, a customer in the store during the robbery. Officer Sims' gun was found in appellant's pocket after he was arrested and searched. Jack Alexander also identified appellant as being present at the time he was robbed a few moments after the trio left the store. Alexander saw the robbery in progress inside the store and when they finally exited the store he was robbed at gunpoint. As to time and place the Alexander robbery was a part of the res gestae.
The three suspects were given the Miranda rights and warnings immediately after being arrested and each said he understood his rights.
In Jackson v. State, 229 Ala. 48, 155 So. 581, the Court said:
 "Evidence of other and distinct criminal offenses, at other times and places, is admitted in evidence only in exceptional cases and for limited purposes. Among *Page 397 
these are cases where such evidence may throw light on the motive, intent, scienter, or identity, and so tend to establish the guilt of the party of the offense for which he is being tried. The details of such other crimes are not admissible, except in so far as essential to disclose the motive or other matter for which it is admitted. Gassenheimer v. State, 52 Ala. 313; Ingram v. State, 39 Ala. 247, 84 Am.Dec. 782; Moore v. State, 10 Ala. App. 179, 64 So. 520; Davis v. State, 213 Ala. 541, 105 So. 677.
 "But this case is governed by another and different principle. Everything constituting the one continuous transaction is admissible as of the res gestae. No matter how many distinct crimes may be involved, all the details of the one continuous criminal occurrence or adventure may be considered by the jury in passing upon the culpability, the wickedness, and depravity of the crime for which the party is being tried. In cases of robbery the jury is given a wide range of discretion in fixing the punishment. They may look to all the circumstances constituting part of the res gestae in meting out punishment within the limits prescribed by law. It follows all these circumstances are the subject of legitimate argument on the part of the solicitor. Ingram v. State, supra; Kennedy v. State, 182 Ala. 10, 62 So. 49; Smith v. State, 88 Ala. 73, 7 So. 52; 16 C.J. § 1115."
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.