BASCHAB, Presiding Judge.
 

 The appellant, Troy Edward Connell, was convicted of three counts of capital murder for the killing of Steven C. Spears, Jr. (“Steven”) and one count of second-degree assault for the assault of Monica Spears (“Monica”), a violation of § 13A-6-21(a)(2), Ala.Code 1975. The murder was made capital because he committed it through the use of a deadly weapon while the victim was in a vehicle, a violation of § 13A-5-40(a)(17), Ala.Code 1975; because he committed it through the use of a deadly weapon fired from a vehicle, a violation of § 13A-5-40(a)(18), Ala.Code 1975; and because he committed it during the course of a first-degree robbery or an attempt thereof, a violation of § 13A-5-40(a)(2), Ala.Code 1975. The trial court sentenced him to imprisonment for life without the possibility of parole on the capital murder convictions and to serve a consecutive term of ten years in prison on the assault conviction. The appellant filed a “Motion to Hold Sentence of Life Without Parole Unconstitutional as Applied to Juvenile Defendant and To Resentence the Defendant,” which the trial court summarily denied. This appeal followed.
 

 Monica testified that she was married to Steven; that they attended a party on the evening of December 10, 2004, and started driving home around 11:00 p.m.; and that they stopped around 11:10 p.m. or 11:15 p.m. to get a drink and continued toward their home. She also testified that, while they were on Highway 139 at approximately 11:30 p.m., a vehicle drove up behind them quickly and appeared to have its bright lights on; that Steven slowed down several times, and the vehicle eventually tried to pass them; that, as the vehicle got beside their vehicle, she “heard a boom,” and their vehicle started slowing down; that she saw that the vehicle’s window had
 
 *1074
 
 been shattered and Steven had his head down; that their vehicle came to a stop and was partially on the road and partially on the side of the road; and that she checked Steven and realized he had been shot. (R. 406.)
 

 Monica testified that she telephoned 911 and then flagged down a red sport utility vehicle; that she approached the passenger side of the vehicle, and the passenger side window was down; that she could see the driver, the passenger, and a third person in the back seat; that she told them what happened and asked for help; and that she got back into her own vehicle and telephoned 911 again. She also testified that the driver of the other vehicle approached Steven, and the passenger approached her; that she felt something hit her face and saw blood dripping; that she looked up and saw that the passenger was hitting her with a chain; that, as the passenger continued to hit her, she stepped out of her vehicle and tried to fight back; that she looked at the driver and Steven and saw the driver pull Steven part of the way out of the vehicle and take his wallet; that the driver and passenger got back into their vehicle and drove away; and that she telephoned her father for help. She further testified that Jimmy Lamar Killingsworth, Jr., was the person who was driving the red sport utility vehicle and who took Steven’s wallet and that the appellant was the passenger in the sport utility vehicle who attacked her with a chain.
 

 Brown Bolding, Monica’s father, testified that Monica telephoned him at about 11:30 p.m. on December 10, 2004; that she asked him to come and help her; and that he went to the scene and discovered that Steven was dead.
 

 Justin Killingsworth, Lamar’s cousin, testified that Lamar came to his residence at approximately 4:00 a.m. on December 11, 2004; that Lamar telephoned the appellant; and that the appellant picked him up about twenty minutes later in a red Tahoe sport utility vehicle.
 

 James Lee, the appellant’s uncle, testified that he asked the appellant about the allegations against him and about what happened. The following occurred during his testimony:
 

 “[LEE:] He told me that Lamar had them stop at a convenience store in Montevallo. Lamar went into the store. Mr. Spears was in the store at the time. Lamar was standing behind the gentleman acting like he was punching him in the back of the head. They leave the store. Troy and Lamar and them leave the store before they leave the store. Lamar has him to go to 139, pull off the shoulder of the road at 25 and 139 and wait on them until they pass by.
 

 “[PROSECUTOR:] So Troy is driving?
 

 “[LEE:] Yes, sir.
 

 “[PROSECUTOR:] What else does he tell you?
 

 “[LEE:] He told me that after they turn on to 139 that Lamar told him, follow them.
 

 [[Image here]]
 

 “... He told me that Lamar told him and said get up behind them and start blowing the horn.
 

 [[Image here]]
 

 “... Little Troy said he done that. And then Lamar told him ...
 

 [[Image here]]
 

 “... Lamar told him, ‘[F]— it, pass him.’ Then he told me, when they went to pass is when he heard a loud boom. He looked over. He seen Lamar hanging out the window with the gun.
 

 “[PROSECUTOR:] Did he tell you where Lamar was seated?
 

 
 *1075
 
 “[LEE:] Yes, sir.
 

 “[PROSECUTOR:] Where was Lamar?
 

 “[LEE:] Lamar and Mark had swapped seats when they was at the convenience store.
 

 “[PROSECUTOR:] So Mark is where?
 

 “[LEE:] In the right back side. Lamar was in the right front.
 

 “[PROSECUTOR:] And Troy tells you that he is driving and Lamar does the shooting?
 

 “[LEE:] Yes, sir.
 

 “[PROSECUTOR:] Okay. And he doesn’t mention anything — he didn’t mention anything on that date to you that Mark Jones did, did he?
 

 “[LEE:] No, sir.
 

 [[Image here]]
 

 “[PROSECUTOR:] Did Troy at any time tell you that he was so intoxicated he was passed out and didn’t know what was going on?
 

 “[LEE:] No, sir.”
 

 (R. 499-501.) Lee also testified that the appellant’s vehicle was taken to a body shop and that the appellant stayed in a motel for a few nights shortly after the murder and assault occurred.
 

 Brad Abbott, a coach at Jemison High School, testified that, on December 10, 2004, he and Coach Brent Hubbard were going home from Birmingham; that, around 10:00 p.m. or 10:30 p.m., while they were near Highway 139, a red sport utility vehicle pulled behind them at a high rate of speed and flashed its lights trying to get them to pull over; that they pulled into a church parking lot; and that the other vehicle pulled in at an angle toward the driver’s side door, and its passenger side window was down. He also testified that the passenger, who he identified as the appellant, said he thought they were someone else; that they started to pull away, and the passenger asked them where they got their vehicle, as if in an attempt to keep them there; and that they drove away toward Highway 139, and the vehicle followed them, but they eventually lost sight of it.
 

 Mark Jones testified that the appellant and Lamar picked him up shortly after dark on December 10, 2004; that the appellant was driving at that time; that they drove around for a few hours; that the appellant asked him if he wanted to spend the night with him and go hunting the next morning, he agreed, and they went to his house to get a shotgun; that, when he came out of his house, Lamar was in the driver’s seat, and the appellant was in the passenger seat; and that he gave the shotgun to the appellant and got into the back seat. He also testified that they drove around for approximately one hour afterward; that they were using cocaine, but did not have enough for three people to get high; that they came to a vehicle and the appellant told Lamar to flash the lights, and Lamar did; that the vehicle pulled into a church parking lot, and the appellant spoke to the men in the vehicle; that the vehicle started driving away, and the appellant tried to stop it, but it drove away; and that they followed the vehicle for approximately one mile.
 

 Jones testified that they saw the Spears’ vehicle, and the appellant told Lamar to speed up and catch it; that they got very close to the Spears’ vehicle, and the appellant told Lamar to speed up and act like he was going to pass it; that the appellant got a shell out of the console and loaded the shotgun; that the appellant rolled down the window and shot into the Spears’ vehicle; and that, afterward, the appellant told Lamar to turn around and go back. He also testified that Lamar pulled behind the Spears’ vehicle; that Monica approached
 
 *1076
 
 their vehicle and asked for help and then returned to her vehicle; that Lamar told the appellant to take care of Monica while he got the wallet; that the appellant got a chain out of the console, went to Monica’s vehicle, and started hitting her with the chain; that Lamar took the wallet from Steven, told the appellant he had the wallet, and said, “ ‘[Ljet’s go’ ”; and that they got back into the vehicle and took the money out of the wallet. (R. 640.) He further testified that they threw out the chain and the wallet; that they went to Birmingham to buy more cocaine; and that the appellant and his mother later told him they would get rid of the shotgun.
 

 Jones admitted that he had previously made a statement in which he said that Lamar had borrowed the appellant’s vehicle and returned and told the appellant he had killed someone in it. However, he testified that he made the statement over the telephone from the appellant’s mother’s house and that the appellant and his mother were present when he made the statement and had told him to tell the story he told.
 

 On December 20, 2004, the appellant made a statement in which he said that he, Jones, and Lamar drove around in his red Tahoe on the afternoon of December 10, 2004; that they went to Rodney Scurlock’s house around 9:00 p.m.; that, around 11:00 p.m., he gave Lamar the key to his vehicle, and Lamar, Rodney, and someone named Matt left in the vehicle to get beer; that, as they were leaving, he noticed that Rodney had a sawed-off shotgun; and that he and Jones stayed at Rodney’s house. He also stated that Lamar, Rodney, and Matt returned around midnight; that Lamar told him he had killed someone in his truck and apologized for having done so; that Lamar appeared to have blood on his shirt; and that he and Jones left and arrived at his house around 12:30 a.m. The appellant further stated that Lamar telephoned them around 2:00 a.m. and that they took him to his uncle’s house and then took him home a few minutes later. Finally, he stated that, during that time, Lamar said he could not believe he shot someone; that he was sorry for having done so; that he drove beside a vehicle, shot a man, drove further down the road, and turned around and returned to the vehicle he had shot into; and that Rodney beat the woman who was riding in the vehicle with a chain.
 

 Finally, the State presented evidence that the appellant’s palm print was on the passenger side of the Spears’ vehicle and that Steven’s wallet was later found in a yard less than two miles from the crime scene.
 

 I.
 

 The appellant’s first argument is that his sentence of imprisonment for life without the possibility of parole constitutes cruel and unusual punishment because he was a juvenile at the time of the offense. Specifically, he contends that, in
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the United States Supreme Court determined that it is unconstitutional to sentence a juvenile as an adult and that, therefore, a sentence of imprisonment for life without the possibility of parole for a juvenile such as he is constitutes cruel and/or unusual punishment under both the United States Constitution and the Alabama Constitution.
 
 [1]
 

 
 *1077
 
 In
 
 Roper,
 
 543 U.S. at 578, 125 S.Ct. at 1200, the United States Supreme Court addressed the narrow question of whether the death penalty was disproportionate for juveniles and held that “[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed.” The Supreme Court’s decision in
 
 Roper
 
 applies only in limited circumstances, and we are not in a position to expand that decision as the appellant would have us do.
 
 See Jones v. State,
 
 946 So.2d 903 (Ala.Crim.App.2006);
 
 Benjamin v. State,
 
 940 So.2d 371 (Ala.Crim.App.2005). Therefore, the appellant’s reliance on
 
 Roper
 
 is misplaced, and his argument is without merit.
 

 II.
 

 The appellant’s second argument is that he was entitled to a jury trial on the issue of his competence to stand trial.
 

 “When a person charged with a crime is before a circuit court, the defendant, the defendant’s attorney, or the district attorney may petition for, or the court on its own motion may order, an examination to assist in the determination of the defendant’s present mental condition and competency to stand trial.”
 

 Rule 11.2(a)(1), Ala. R.Crim. P.
 

 “A motion filed pursuant to this rule shall state facts upon which the mental examination is sought, and such a motion filed by the defendant or the defendant’s attorney must include a written demand for a jury in order to preserve the right to a jury in a subsequent competency hearing conducted pursuant to Rule 11.6; see also Rule 11.6(b)(1) and Rule 11.7(c).”
 

 Rule 11.2(c), Ala. R.Crim. P.
 

 “After the examinations have been completed and the reports have been submitted to the circuit court, the judge shall review the reports of the psychologists or psychiatrists and, if reasonable grounds exist to doubt the defendant’s mental competency, the judge shall set a hearing not more than forty-two (42) days after the date the judge received the report or, where the judge has received more than one report, not more than forty-two (42) days after the date the judge received the last report, to determine if the defendant is incompetent to stand trial, as the term ‘incompetent’ is defined in Rule 11.1. At this hearing all parties shall be prepared to address the issue of competency.”
 

 Rule 11.6(a), Ala. R.Crim. P.
 

 “The circuit court shall notify the defendant, the defendant’s attorney, and the district attorney, in writing, of the date and the time of the competency hearing. Unless the defendant or the defendant’s attorney files a written demand for a jury trial, pursuant to Rule 11.2(c) or within seven (7) days after the defendant’s attorney is notified that the competency issue has been raised by the court or by motion of the district attorney pursuant to 11.2(a), the circuit judge shall determine whether the defendant is competent to stand trial.”
 

 Rule 11.6(b)(1), Ala. R.Crim. P.
 

 “Rule 11.6(a) authorizes the circuit court to make a preliminary determination that reasonable grounds exist to conduct a competency hearing, based on the reports submitted by examining psychologists and/or psychiatrists. Authorizing the court to make this initial determination will avoid mandating a competency hearing when reasonable grounds do not exist to doubt the defendant’s competency to stand trial, as evi
 
 *1078
 
 denced by the reports of the examining psychologists or psychiatrists. While this procedure safeguards valuable court time and resources, it also ensures that the defendant’s right to a competency hearing before a judge or jury will be preserved when reasonable grounds exist to doubt the defendant’s mental competency.
 

 “After reviewing the reports, if the judge finds reasonable grounds to doubt the defendant’s mental competency, the judge must schedule a competency hearing within forty-two (42) days after the date the last report is received.”
 

 Committee Comments to Rule 11.6, Ala. R.Ci’im. P.
 

 We addressed and rejected an argument that was similar to the appellant’s in
 
 Flowers v. State,
 
 922 So.2d 938, 945-46 (Ala.Crim.App.2005), as follows:
 

 “Flowers next argues that under Rule 11.6, Ala. R.Crim. P., the circuit court eri’ed in not holding a competency heai’-ing after receiving the report of his mental evaluation from Dr. Robext DeFran-cisco.
 

 “At ai’raignment Flowers entered a plea of not guilty by reason of mental disease or defect, and he requested that he be permitted to undergo a mental evaluation. The circuit coui’t granted the motion, and Flowers was sent to Taylor Hardin Secure Medical Facility, where he was evaluated by a clinical forensic psychologist — Dr. DeFrancis-co. The report completed by Dr. De-Francisco was filed in the circuit court. The report indicated that Flowers was not mentally incompetent to stand trial and that Dr. DeFrancisco did not believe that Flowers was mentally incompetent at the time of the murder. It was De-Francisco’s opinion that Flowers had no major mental disorder.
 

 “Based on those findings the circuit court did not order a competency hearing. Rule 11.6(a), Ala. R.Crim. P., states, in part:
 

 “ ‘After the examinations have been completed and the reports have been submitted to the court, the judge shall l’eview the reports of the psychologists or psychiatrists and, if reasonable grounds exist to doubt the defendant’s mental competency, the judge shall set a hearing not more than forty-two (42) days after the date the judge received the report.... ’
 

 “This Court in
 
 Tankersley v. State,
 
 724 So.2d 557 (Ala.Crim.App.1998), held that Rule 11.6, Ala. R.Crim. P., does not automatically require a competency hearing. We stated:
 

 “ ‘According to the appellant, he had a light pursuant to Rule 11.6(a), Ala. R.Crim. P., to a competency hearing within 42 days of the receipt of the
 
 report of
 
 his mental examination. ... However, Rule 11.6(a) does not automatically require a competency hearing following the mental examination. Only when the judge finds after a review of the reports that “l-easonable grounds exist to doubt the defendant’s mental competency” is the judge required to set a competency hearing and that hearing must be held not more than 42 days after the judge receives the report. There is no indication that the trial judge in this case ever found reasonable grounds to doubt the defendant’s mental competency. Therefore, the trial judge did not deviate from the procedure outlined in Rule 11.6(a).’
 

 “724 So.2d at 565. As we also stated in
 
 Daniels v. State,
 
 621 So.2d 335 (Ala.Crim.App.1992):
 

 “ ‘Section 15-16-21, Code of Alabama 1975, states:
 

 
 *1079
 
 “ ‘ “If any person charged with any felony is held in confinement under indictment and
 
 the trial court shall have reasonable ground to doubt his sanity,
 
 the trial of such person for such offense shall be suspended until the jury shall inquire into the fact of such sanity.... ”
 

 “ ‘(Emphasis added.)
 

 “ ‘This section places the initial burden on the trial court to determine whether there are “reasonable grounds” to doubt the accused’s sanity. “The trial court is, thus, the ‘screening agent’ for mental examination requests.”
 
 Reese v. State,
 
 549 So.2d 148, 150 (Ala.Cr.App.1989). “ ‘It is left to the discretion of the trial court as to whether there is a reasonable or bona fide doubt as to sanity, and thus, whether a further examination is required.’ ” 549 So.2d at 150. The trial court makes a preliminary determination “without the aid of a jury as to whether reasonable grounds existed to doubt the defendant’s competency.” Rule 11.3, A.R.Crim. P., Committee Comments.’
 

 “621 So.2d at 337. After reviewing the competency report, the circuit court had no reasonable grounds to question Flowers’s competency. Therefore, no hearing was necessary or required by Rule 11.6(a), Ala. R.Crim. P. The circuit court committed no error here.”
 

 The following timeline for this case is helpful to an understanding of this issue:
 

 March 9, 2005 The appellant filed a “Notice of Issue Concerning Competency of Defendant,” requested a jury determination of his competency, and submitted an evaluation by Dr. Marianne Rosenzweig.
 

 March 22, 2005 The trial court entered an “Order for Outpatient Evaluation of Competency to Stand Trial Only.”
 

 March 24, 2005 The State filed a “State of Alabama’s Response to Defendant’s Notice of Issue Concerning Defendant’s Competency.”
 

 July 25, 2005 The forensic evaluation from Taylor Hardin Secure Medical Facility (“Taylor Hardin”) was filed with the trial court. Among other things, the examiner, Brent R. Willis, Psy.D., concluded that the appellant was in need of further evaluation and competency training.
 

 July 28, 2005 The State filed a “Motion for Order of Commitment for Further Evaluation of Defendant for Competency to Stand Trial and Mental State at the Time of the Offense” based on Willis’ recommendation.
 

 August 10, 2005 The trial court entered an “Order of Commitment for Further Evaluation of Competency to Stand Trial and Mental State at the Time of the Offense.”
 

 December 8, 2005 The trial court entered an “Order for Release from Custody of the Alabama Department of Mental Health and Mental Retardation.”
 

 December 12, 2005 A second forensic evaluation from Taylor Hardin was filed with the trial court. Among other things, the examiner, Brent R. Willis, Psy.D., concluded that the appellant was malingering and was competent to stand trial.
 

 July 19, 2006 The appellant filed a “Memorandum on Issue of Right to Jury Trial on Question of Competency.”
 

 July 20, 2006 The State filed a “State’s Brief Concerning Troy Connell’s Competence To Stand Trial.”
 

 August 9, 2006 Rosenzweig made a second forensic evaluation report.
 

 
 *1080
 
 August 23, 2006 The trial court entered an “Order for Outpatient Evaluation of Competency to Stand Trial and Mental State at the Time of the Offense.”
 

 September 11,
 
 2006
 
 A third forensic evaluation from Taylor Hardin was filed with the trial court. The examiner, Dr. Susan D. Gierok, concluded that the appellant was competent to stand trial.
 

 September 21, 2006 The trial court conducted a hearing to make a preliminary determination as to whether the appellant was competent to stand trial.
 

 October 18, 2006 The trial court entered an order in which it found that there were not any reasonable grounds to doubt the appellant was competent to stand trial.
 

 In its order in which it found that there were not any reasonable grounds to doubt the appellant was competent to stand trial, the trial court stated:
 

 “This Court DENIES the Defendant’s request for a jury trial on the issue of competence because the Defendant failed to meet his burden of proving ‘reasonable grounds exist to doubt the defendant’s mental competency.’ Ala. R.Crim. P. 11.6. Based on the facts and expert opinions presented, in addition to this Court’s personal observations of the Defendant, this Court finds that no reasonable grounds exist to doubt whether the Defendant can assist his attorneys with a rational understanding of his legal situation.
 

 “Both State experts found that the Defendant was competent to stand trial and any problems with memory or understanding legal concepts was most likely due to malingering. The Defendant’s expert, Dr. Marianne Rosenzweig, initially found that ‘[ojther than his low intellectual capacity, I am not aware of any other factors that would interfere with [the Defendant’s] ability to function adequately as a criminal defendant.’ Dr. Rosenzweig changed her opinion and stated in her second report that the Defendant was incompetent because he was mentally retarded; a determination she did not make in her first report. In an abundance of caution, this Court conducted a hearing to give the Defendant the opportunity to present Dr. Rosenzweig’s testimony and the State the opportunity to rebut her testimony. At the hearing, Dr. Rosenzweig opined that the Defendant’s alleged mental retardation was due to a possible brain injury and further testing should be conducted to determine whether such an injury existed. Dr. Susan Gierok, the State’s neuropsychological expert, testified that the Defendant is competent to stand trial; there is no evidence he suffers from a severe brain injury; and further testing for a possible brain injury would not benefit this Court’s competency determination.
 

 “Under Rule 11.1, this Court (or a jury) may find that a Defendant is incompetent to stand trial only ‘if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant.’ Under this definition, to be entitled to a jury trial on the question of competence, the Defendant was required to show that ‘reasonable grounds exist to doubt’ whether the Defendant can currently assist and consult with his attorney and whether he possess a rational understanding of the facts and legal proceedings now facing him. Ala. R.Crim. P. 11.6.
 

 “In short, the Defendant attempted to prove reasonable grounds exist to doubt his competence by creating the question of whether he is mentally retarded and
 
 *1081
 
 suffers from a severe brain injury. This theory misses the point of Rule 11. The Court of Criminal Appeals has held that ‘even if a serious mental illness causes a defendant to commit an offense, that defendant may still be competent to stand trial so long as he has sufficient understanding of the proceedings against him and an ability to aid his counsel in preparation for his defense.’
 
 Tankersley v. State,
 
 724 So.2d
 
 557, 565
 
 (Ala.Crim.App.1998). Indeed, Dr. Rosenzweig admitted during the hearing that a person with a low IQ, mental retardation, and/or a brain injury may still be competent to stand trial in a criminal case. In fact, Dr. Rosenzweig testified that a majority of persons who are mentally retarded
 
 are
 
 competent to stand trial. Consequently, even if this Court were to find ‘reasonable grounds’ exist to believe the Defendant is mentally retarded and has suffered a brain injury' — which this Court does not — -the Defendant still would not be entitled to a jury trial on the issue of competency.
 

 “This Court finds no reasonable grounds exist to doubt that the Defendant has a rational understanding of his legal situation. This Court ordered the Defendant be sent to a competency training class. As Dr. Brent Willis reported, the Defendant was ‘uncooperative’ and ‘did not put forth maximum effort’ while taking this class. Upon being told his sessions were being terminated, the Defendant questioned how he could be sent back to jail ‘since he did not know the court stuff and that he wanted to call his attorney.
 

 “Regardless, as Dr. Gierok testified, the Defendant has shown the ability to answer competency-related questions when putting forth effort and/or when he is under the belief that it is to his benefit to do so. For example, the Defendant was able to successfully discuss with Dr. Gierok his current charge, possible pleas, the role of witnesses and the jury, and a general understanding of capital murder sentencing. The Defendant told Dr. Gierok ‘that when simple terminology was used, he was able to understand the information and that he had difficulty understanding the terminology used by his attorney.’ During the occasions when the Defendant failed to correctly answer competency-related questions, he has frequently stated that he either does not know the answer or he has simply refused to try. As Dr. Willis stated in his report, the Defendant’s on-and-off again ability to answer competency questions was likely ‘an attempt by Mr. Connell to malinger and avoid eventual prosecution.’
 

 “This Court finds that it is not reasonable to believe that the Defendant does not have a rational understanding of the current legal proceedings. In fact, this Court finds that based on the facts presented and this Court’s personal observations, the only ‘reasonable’ explanation for the Defendant’s fluctuating ability to understand the current legal proceedings is the opinion given by both State experts: The Defendant is intentionally malingering. Of course, this intentional malingering is further proof the Defendant understands the current legal proceedings and how to use them to his benefit.
 

 “This Court also finds there are no reasonable grounds to doubt that the Defendant can assist his attorneys at trial. This Court has observed Mr. Con-nell on several occasions in a courtroom setting. Dr. Rosenzweig’s opinion that Connell cannot remain calm or focused during trial is unreasonable, as Connell has consistently kept focus during his proceedings thus far; including the six hour hearing on his competency motion.
 
 *1082
 
 Most tellingly, this Court observed the Defendant testify at the trial of his eo-defendant. At that trial, the Defendant met with substitute counsel for the first time on the day of his testimony; yet, he was able to take cues from his attorney when to answer questions and when not to answer questions. Furthermore, the Defendant appeared to understand each question asked of him and responded correctly to each question he answered. Accordingly, there is no reasonable ground to doubt the Defendant can assist his attorneys in his defense or that the Defendant can maintain a proper demeanor in the courtroom during trial.
 

 “Finally, while mental retardation and brain injuries alone do not provide reasonable grounds to doubt competence for the reasons stated above, this Court briefly addresses each of these defense theories. The Court finds that it is unreasonable to believe the Defendant is mentally retarded based on the facts presented. On his IQ tests administered before his arrest for capital murder, the Defendant garnered full-scale IQ scores of 84, 76, and 69, which refute a finding of mental retardation. It was only after the Defendant’s arrest that his IQ scores dropped to 53 and 54. This Court finds that the Defendant’s 31-point drop in IQ score does not reasonably prove retardation in the Defendant’s cognitive ability. Instead, it provides further reason to believe the Defendant intentionally malingered on his IQ tests once charged with the present crime. Furthermore, the Defendant’s abilities to drive vehicles and to pass the written/oral portion driver’s license test after two hours of teaching provide reasons to believe the Defendant has adaptive ability. This Court specifically finds Dr. Rosenzweig’s reliance on the Defendant’s mother’s (who is presently charged with hindering her son’s prosecution) SIB-R score to prove a retarded adaptive functioning is unreasonable. Furthermore, because it is unreasonable to believe the Defendant is mentally retarded, Rosenzweig’s reliance on the CAST-MR competency test, which is given to mentally retarded person, is also unreasonable.
 

 “As for a possible brain injury, the Defendant provided nothing more than speculation and conjecture from an expert who admits to not being a neuro-physiologist and to not administering an MRI or CAT-SCAN to the Defendant. This Court finds it unreasonable to believe that the Defendant suffered from a serious brain injury that might result in incompetence simply because the Defendant was involved in relatively normal childhood accidents. Most importantly, as Dr. Gierok testified, further testing to prove or disprove such speculation would not assist this Court in determining competency. Simply put, the events that caused this disputed and highly speculative brain injury happened prior to the charged crime and the Defendant has shown his competence to stand trial
 
 since
 
 those events occurred. Thus, even if a brain injury occurred, it has not affected the Defendant’s competence, which is the only question before this Court.
 

 “For the reasons stated above, this Court finds that ‘no reasonable grounds exist’ to doubt the Defendant’s competence to stand trial. Accordingly, this Court hereby DENIES the Defendant’s request for a jury trial on the question of competence.”
 

 (C.R. 441-43.) The record supports the trial court’s findings, and we adopt them as part of this opinion.
 

 Pursuant to Rule 11.6(a), Ala. R.Crim. P., the trial court had the authority to make a preliminary determination regard
 
 *1083
 
 ing whether there were reasonable grounds to doubt that the appellant was competent to stand trial. In this case, the trial court received and considered several mental evaluations from both the State and the defense, conducted a hearing at which it allowed the parties to present evidence in support of their respective positions, and afterward made a preliminary determination that there were not any reasonable grounds to conduct a competency hearing. Because it determined that there were not any grounds to doubt that the appellant was competent to stand trial, the appellant was not entitled to a jury trial on the issue.
 
 See Floivers,
 
 supra. Therefore, the appellant’s argument is without merit.
 

 III.
 

 The appellant’s third argument is that the victim’s in-court identification should have been suppressed due to an allegedly impermissibly suggestive pre-trial identification.
 

 “ ‘In determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony, the central question is whether, under the totality of the circumstances, the identification was reliable.
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). This determination involves the application of a two-pronged test.
 

 “ ‘ “[T]he required inquiry is two-pronged. The first question is
 
 whether the initial identification procedure was ‘unnecessarily’
 
 ...
 
 or ‘impermissibly’ ... suggestive.
 
 If it is found to have been so, the court must then proceed to the question whether the procedure found to have been ‘unnecessarily’ or ‘impermissibly’ suggestive was
 
 so ‘conducive to irreparable mistaken identification’
 
 ...
 
 or had such a tendency ‘to give rise to a very substantial likelihood of irreparable misidentification
 
 ’ ... that allowing the witness to make an in-court identification would be a denial of due process.”
 
 United States ex rel. Phipps v. Follette,
 
 428 F.2d 912, 914-15 (2d Cir.1970).’
 

 “Brazell v. State,
 
 369 So.2d at 28-29 (emphasis added).
 
 See also Donahoo v. State,
 
 371 So.2d 68, 72 (Ala.Crim.App. 1979). In evaluating the likelihood of misidentification, the court must consider the following factors:
 

 “ ‘[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness’s degree of attention, [3]
 
 the accuracy of the ivitness’s prior description of the criminal,
 
 [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.’
 

 “Neil v. Biggers,
 
 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972) (emphasis added). ... Nevertheless, ‘[t]he rule regarding the exclusion of pretrial identifications has been that evidence of a pretrial identification need not be excluded if the State can prove
 
 by clear and convincing evidence
 
 that the identification stems from a source independent of the unfair pretrial confrontation.’
 
 Ex parte Frazier,
 
 729 So.2d [253,] 259 [ (Ala.1998) ].”
 

 Ex parte Appleton,
 
 828 So.2d 894, 900 (Ala.2001).
 

 “In the instant case there is some question as to whether the pretrial identification procedures were in fact imper-missibly suggestive. ‘Each case is to be considered on its own facts in determining whether the photographic identification procedure was so impermissibly suggestive as to give rise to a very
 
 *1084
 
 substantial likelihood of irreparable mis-identification.’
 
 Fitchard v. State,
 
 424 So.2d 674, 676 (Ala.Cr.App.1982). See
 
 Simmons v. United States,
 
 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) .... However, assuming that the pretrial identification procedures were in fact impermissibly suggestive, ‘when an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is properly admitted into evidence.’
 
 Mullis v. State,
 
 545 So.2d 205, 209 (Ala.Cr.App.1989); see also
 
 Coleman v. State,
 
 487 So.2d 1380 (Ala.Cr.App.1986), cert. denied, 499 U.S. 911, 111 S.Ct. 1118, 113 L.Ed.2d 227 (1991);
 
 Jackson v. State,
 
 414 So.2d 1014 (Ala.Cr.App.1982);
 
 Matthews v. State,
 
 401 So.2d 241 (Ala.Cr.App.1981), cert. denied, 401 So.2d 248 (Ala.1981). The identification is correctly received into evidence when it ‘stems from an independent source rather than the photographic lineup.’
 
 Hutchinson v. State,
 
 516 So.2d 889, 893 (Ala.Cr.App. 1987). ‘Reliability is the linchpin in determining the admissibility of identification testimony.’
 
 Mullis,
 
 545 So.2d at 209.”
 

 Jenkins v. State,
 
 627 So.2d 1034, 1047 (Ala.Crim.App.1992), aff'd, 627 So.2d 1054 (Ala.1993).
 

 During a discussion about the appellant’s motion to suppress Monica’s identification of him, the following occurred:
 

 “[DEFENSE COUNSEL]: Judge, we filed a motion to suppress identification of the Defendant by Monica Spears. I don’t know if she would be making an in court identification or not.
 

 “[PROSECUTOR]: Identification in what way, just her pointing and saying that’s the person?
 

 “[DEFENSE COUNSEL]: Yes.
 

 “[PROSECUTOR]: That’s the person that hit her with the chain?
 

 “[DEFENSE COUNSEL]: Yes.
 

 “[PROSECUTOR]: I don’t see why she couldn’t say that. She had personal knowledge.
 

 “THE COURT: What’s the basis of your motion?
 

 “[DEFENSE COUNSEL]: The basis is she was unable to identify him out of a photograph lineup. We don’t know at what point in time she was able to make an identification. If it was when he appeared in court, then we would submit that that’s tantamount to an improper show up and that there would have to be an actual [hearing] before the Court to determine whether there was an independent basis to allow that identification to go forward.
 

 “[PROSECUTOR]: Your Honor, that’s — it’s not credibility. Your Honor has heard the basis of her knowledge of where she—
 

 “[DEFENSE COUNSEL]: I haven’t, Judge. If it was in another trial, it has got nothing to do with me.
 

 “THE COURT: I understand. I think that the Court is going to deny the motion. And the information, your argument really would go rather to the — I guess it would be more for impeachment purposes. So I think that would be more appropriate for impeachment purposes than it would be with regard to whether she can actually make that identification. There may be a perfectly good explanation.”
 

 (R. 352-53.)
 

 During the trial, Monica testified that she approached the appellant’s vehicle and could see the three occupants through the open passenger window; that the lights were on in that vehicle, and the lights from her vehicle also provided illumination; that she saw the faces of all three occupants of the vehicle; and that there was not any
 
 *1085
 
 thing blocking the appellant’s face at that time. She also testified that she observed the appellant’s face when he was beating her with the chain, both when she was in her vehicle and when she got out of her vehicle, and that there was not anything blocking his face at either of those times. Monica further testified that she was approximately one foot away from the appellant on at least three occasions and that she was sure the person she saw in court was the same person.
 

 On cross-examination, Monica testified that she examined several photographic lineups; that she said the appellant looked familiar; and that she did not remember being asked to make a positive identification. Defense counsel also extensively cross-examined her about the prior lineups and the fact that she did not positively identify the appellant then; about the differences between the appellant’s appearance and the appearance of the person in the sketch she helped a sketch artist compile; and the fact that she first identified the appellant after he was arrested and she saw him in court.
 

 After Monica testified, the defense reasserted its challenge to her in-court identification. At that time, the trial court examined each of the factors set forth in
 
 Neil v. Biggers,
 
 supra, and rejected the defense’s argument.
 

 We agree with the trial court’s decision. The evidence established that Monica had ample opportunity to observe the appellant from a distance of approximately one foot at least three separate times on the night of the murder and assault; that she paid sufficient attention to the appellant to identify him, even though she was upset; that she said the appellant looked familiar when she saw him in a photographic lineup a few days afterward; and that she indicated in court that she was sure the appellant was the person who assaulted her. Therefore, even if her pretrial identification was gained by impermissibly suggestive means, her trial testimony was clearly based on her independent recollection of the appellant and the events on the night of the murder and assault. Accordingly, the appellant’s argument is without merit, and the trial court properly admitted the in-court identification into evidence.
 

 IV.
 

 The appellant’s fourth argument is that “[i]t was error for the Court to allow evidence of a prior bad act to show character of the defendant in conformity therewith, particularly when no prior notice had been provided to [him] that the evidence was to be used for another purpose.” (Appellant’s brief at p. 43.) Specifically, he contends that the trial court improperly admitted evidence about the encounter with Abbott. Rule 404(b), Ala. R. Evid., provides:
 

 “Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
 

 In
 
 Rowell v. State,
 
 570 So.2d 848, 852 (Ala.Crim.App.1990), we held that evidence regarding uncharged crimes or acts may properly be admitted under the following circumstances:
 

 “ ‘Evidence of the accused’s commission of another crime is admissible if
 
 *1086
 
 such other crime is inseparably connected with or is a part of the
 
 res gestae
 
 of the now-charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence.’ C. Gamble,
 
 McElroy’s Alabama Evidence
 
 (3d ed.1977), § 69.01(3). See also
 
 Orr v. State,
 
 462 So.2d 1013, 1015 (Ala.Cr.App.1984). ‘Evidence of other crimes is properly admissible as part of the res gestae if all of the criminal acts are part of one continuous criminal adventure by the same party occurring within a matter of hours.
 
 Miller v. State,
 
 405 So.2d 41 (Ala.Crim.App.1981). See also
 
 Moseley v. State,
 
 357 So.2d 390 (Ala.Crim.App.1978);
 
 Summers v. State,
 
 348 So.2d 1126 (Ala.Crim.App.), cert. denied, 348 So.2d 1136 (Ala.1977).’
 
 Pettaway v. State,
 
 494 So.2d 884, 886 (Ala.Cr.App.1986). In the present case, this evidence ‘was intimately connected with the same transaction which is the basis of the State’s case. ... The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State’s case-in-chief rests within the sound discretion of the trial judge.’
 
 Blanco v. State,
 
 515 So.2d 115, 120 (Ala.Cr.App.1987), and cases cited therein. ‘The trial court did not err in overruling appellant’s objection to the admission of such evidence. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which the defendant is charged.’
 
 Coleman v. State,
 
 487 So.2d 1380, 1385 (Ala.Cr.App.1986) and cases cited therein.”
 

 Also, in
 
 Travis v. State,
 
 776 So.2d 819, 857-58 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), we stated:
 

 “[A]s we held in
 
 Twilley v. State,
 
 472 So.2d 1130, 1135-37 (Ala.Cr.App.1985):
 

 “ ‘The rule has been stated many times by the appellate courts of this State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible.
 
 Byrd v. State,
 
 257 Ala. 100, 57 So.2d 388 (1952);
 
 Keith v. State,
 
 253 Ala. 670, 46 So.2d 705 (1950);
 
 Leverb v. State,
 
 252 Ala. 308, 42 So.2d 532 (1949);
 
 Stallings v. State,
 
 249 Ala. 580, 32 So.2d 236 (1947);
 
 McCoy v. State,
 
 232 Ala. 104, 166 So. 769 (1936);
 
 Jordan v. State,
 
 81 Ala. 20, 1 So. 577 (1886);
 
 Golden v. State,
 
 39 Ala.App. 361, 103 So.2d 52, reversed on other grounds, 267 Ala. 456, 103 So.2d 62 (1958);
 
 Sexton v. State,
 
 28 Ala.App. 59, 180 So. 729 (1937);
 
 Newman v. State,
 
 25 Ala.App. 526, 149 So. 724 (1933);
 
 Roberts v. State,
 
 25 Ala.App. 477, 149 So. 356 (1933).’
 

 “In the present case, the collateral crimes involved were all part of one continuous criminal transaction, or
 
 res gestae,
 
 and the evidence relating to each offense was inseparable from evidence relating to the others.”
 

 In this case, the encounter with the coaches and the murder of Steven and assault of Monica were clearly part of one continuous transaction. In fact, Jones testified that they saw and started following the Spears’ vehicle a short time after they followed the coaches as they left the church parking lot. Thus, the encounter with the coaches was inseparably connected to the murder of Steven and assault of Monica, and the evidence about that encounter was admissible.
 

 Moreover, although the appellant argues about not receiving prior notice that the State would seek to introduce the evidence, the defense did not argue that it was not actually aware that the State
 
 *1087
 
 would seek to introduce such evidence. In fact, based on the comments defense counsel made when he objected, it is obvious that the defense knew the gist of Abbott’s testimony before the State introduced it. Also, although the appellant makes general allegations concerning the evidence about the encounter being improperly admitted, he has not shown how he was prejudiced by the admission of that evidence.
 

 Finally, any error in the admission of the evidence was harmless because the evidence of the appellant’s guilt was overwhelming.
 
 See Hooker v. State,
 
 840 So.2d 197 (Ala.Crim.App.2002).
 

 V.
 

 The appellant’s fifth argument is that the State did not present sufficient evidence to support his conviction for the capital offense of robbery-murder. Specifically, he contends that “there was no Robbery planned, and the taking of the victim’s wallet was an afterthought of the shooting.” (Appellant’s brief at p. 47.)
 

 “In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution.
 
 Cumbo v. State,
 
 868 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case.
 
 Gunn v. State,
 
 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty.
 
 Thomas v. State,
 
 363 So.2d 1020 (Ala.Cr. App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt.
 
 Willis v. State,
 
 447 So.2d 199 (Ala.Cr.App.1983);
 
 Thomas v. State.
 
 When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error.
 
 Young v. State,
 
 283 Ala. 676, 220 So.2d 843 (1969);
 
 Willis v. State.”
 

 Breckenridge v. State,
 
 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
 

 “ ‘In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.’
 
 Faircloth v. State,
 
 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed,
 
 Ex parte Faircloth,
 
 [471] So.2d 493 (Ala.1985).
 

 [[Image here]]
 

 “ ‘ “The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is
 
 legally
 
 sufficient to allow submission of an issue for decision to the jury.”
 
 Ex parte Bankston,
 
 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.”
 
 Kelly v. State,
 
 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal.
 
 Roberson v. State,
 
 162 Ala. 30, 50 So. 345 (1909). “[Wjhere there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the
 
 *1088
 
 defendant is in sharp conflict therewith and presents a substantial defense.”
 
 Fuller v. State,
 
 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied,
 
 Fuller v. Alabama,
 
 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).’
 
 Granger [v. State],
 
 473 So.2d [1137,] 1139 [ (Ala.Crim.App.1985) ].
 

 “... ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’
 
 White v. State,
 
 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’
 
 Cochran v. State,
 
 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds,
 
 Ex parte Cochran,
 
 500 So.2d 1179 (Ala.1985).”
 

 White v. State,
 
 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Also,
 

 “ ‘[circumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt.
 
 Ward v. State,
 
 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.
 
 Cumbo v. State,
 
 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala.1979).’
 

 ‘Ward,
 
 610 So.2d at 1191-92.”
 

 Lockhart v. State,
 
 715 So.2d 895, 899 (Ala.Crim.App.1997).
 

 Section 13A-5-40(a)(2), Ala. Code 1975, provides that a murder committed “by [a] defendant during a robbery in the first degree or an attempt thereof committed by the defendant” constitutes capital murder.
 

 “A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
 

 “(1) Is armed with a deadly weapon or dangerous instrument; or
 

 “(2) Causes serious physical injury to another.”
 

 § 13A-8-^l(a), Ala.Code 1975.
 

 “A person commits the crime of robbery in the third degree if in the course of committing a theft he:
 

 “(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
 

 “(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.”
 

 § 13A-8-43(a), Ala.Code 1975.
 

 “To sustain a conviction under § 13A-5-40(a)(2) for capital robbery-murder, the state must prove beyond a reasonable doubt: (1) a ‘robbery in the first degree or an attempt thereof,’ as defined by § 13A-8-41; (2) a ‘murder,’ as defined by § 13A-6-2(a)(l); and (3) that the murder was committed ‘during’ the robbery or attempted robbery, i.e., that the murder was committed ‘in the course of or in connection with the commission of, or in immediate flight from
 
 *1089
 
 the commission of the robbery or attempted robbery in the first degree, § 13A-5-39(2).
 
 Connolly v. State,
 
 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning •with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing.
 
 Davis v. State,
 
 536 So.2d 110 (Ala.Cr.App.1987);
 
 Magwood v. State,
 
 494 So.2d 124 (Ala.Cr.App.1985), aff'd,
 
 Ex parte Magwood,
 
 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing.
 
 Clark v. State,
 
 451 So.2d 368 (Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala.1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs.
 
 Thomas v. State,
 
 460 So.2d 207 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984).
 

 “ ‘As the Alabama Supreme Court held in
 
 Cobern v. State,
 
 273 Ala. 547, 142 So.2d 869 (1962), “the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.”
 
 Clements v. State,
 
 370 So.2d 708, 713 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979);
 
 Clark v. State,
 
 451 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position “would be tantamount to granting to would-be robbers a license to kill them victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.”
 
 Thomas v. State,
 
 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984).
 

 “ ‘Although a robbery committed as a “mere afterthought” and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see
 
 Bufford v. State,
 
 supra,
 
 O’Pry v. State,
 
 supra [642 S.W.2d 748 (Tex.Cr.App.1981) ], the question of a defendant’s intent at the time of the commission of the crime is usually an issue for the jury to resolve.
 
 Crowe v. State,
 
 435 So.2d 1371, 1379 (Ala.Cr.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim’s property and fled.
 
 Cobern v. State,
 
 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant’s intent to rob the victim can be inferred where “[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.”
 
 Thomas v. State,
 
 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984). See also
 
 Cobern v. State,
 
 273 Ala. 547, 142 So.2d 869 (1962);
 
 Crowe v. State,
 
 435 So.2d 1371 (Ala.Cr.App.1983);
 
 Bufford v. State,
 
 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980);
 
 Clements v. State
 
 370 So.2d 708 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979).’
 

 “Connolly,
 
 500 So.2d at 63.”
 

 Hallford v. State,
 
 548 So.2d 526, 534-35 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989).
 

 “It is sometimes said that a robbery committed as a ‘mere afterthought’ and unrelated to the murder will not sustain
 
 *1090
 
 a conviction for the capital offense of murder-robbery.
 
 Connolly v. State,
 
 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). However, the appellant’s intent to rob the victim may lawfully and correctly be inferred where the killing and the robbery were part of a continuous chain of events.
 
 Hallford v. State,
 
 548 So.2d 526 (Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).”
 

 Harris
 
 v. State,
 
 671 So.2d 125, 126 (Ala.Crim.App.1995).
 

 Alabama’s accomplice liability statute provides:
 

 “A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
 

 [[Image here]]
 

 “(2) He aids or abets such other person in committing the offense.... ”
 

 § 13A-2-23, Ala.Code 1975.
 

 “The words ‘aid and abet’ encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary.
 
 Wright [v. State,
 
 494 So.2d 936 (Ala.Crim.App.1986)];
 
 Sanders v. State,
 
 423 So.2d 348 (Ala.Cr.App.1982). Actual participation in the crime need not be proved by positive testimony to convict someone of aiding and abetting. ‘The jury is to determine whether the appellant’s participation exists and the extent of it from the conduct of the parties and all the testimony presented.’
 
 Walls v. State,
 
 378 So.2d 1186, 1191 (Ala.Cr.App.1979), cert. denied,
 
 Ex parte Walls,
 
 378 So.2d 1193 (Ala.1980). Such facts as the defendant’s presence in connection with his companionship, and his conduct at, before and after the commission of the act, are potent circumstances from which participation may be inferred.”
 

 Henry v. State,
 
 555 So.2d 768, 769 (Ala.Crim.App.1989).
 

 “Amy word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal. ... No particular acts are necessary to make one an aider and abettor; the common enterprise or adventure may have been entered into on the spur of the moment without prearrangement or participation.”
 

 Scott v. State,
 
 374 So.2d 316, 318-19 (Ala.1979). And,
 

 ‘“[w]here the evidence is conflicting as to the defendant’s connection as an accomplice or co-conspirator, a jury question is presented.’
 
 Sanders v. State,
 
 [423 So.2d 348 (Ala.Crim.App.1982) ], citing
 
 Watkins v. State,
 
 357 So.2d 156, 160 (Ala.Crim.App.1977), cert. denied, 357 So.2d 161 ([Ala.] 1978).”
 

 Henry,
 
 555 So.2d at 770. Finally,
 

 “ ‘[i]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’
 
 McCord v. State,
 
 501 So.2d 520, 528-529 (Ala.Cr.App.1986), quoting
 
 Pumphrey v. State,
 
 156 Ala. 103, 47 So. 156 (1908).”
 

 French v. State,
 
 687 So.2d 202, 204 (Ala.Crim.App.1995), aff'd in part, rev’d in part on other grounds, 687 So.2d 205 (Ala.1996).
 

 “ ‘The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury.
 
 McMurphy v. State,
 
 455 So.2d 924 (Ala.
 
 *1091
 
 Crim.App.1984);
 
 Craig v. State,
 
 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).’
 
 Loper v. State,
 
 469 So.2d 707, 710 (Ala.Cr.App.1985).”
 

 Oryang v. State,
 
 642 So.2d 989, 994 (Ala.Crim.App.1994).
 

 Although the appellant argues that the robbery was a mere afterthought, intent was a question for the jury to resolve. In this case, the jury could have reasonably concluded from the facts and circumstances that the robbery began when the appellant and Lamar approached the victims; that the capital offense was consummated when Lamar took Steven’s wallet and fled; that the killing and robbery were part of a continuous chain of events; that the appellant was an accomplice to the robbery; and that the robbery was intentional and was not a mere afterthought. Therefore, the appellant’s argument is without merit.
 

 VI.
 

 The appellant’s sixth argument is that the trial court improperly admitted into evidence State’s Exhibits # 39 and # 40, which were poster-sized photographs showing Steven’s body before the autopsy. Specifically, he contends that they “were cumulative, possessed no probative value and tended only to inflame the jury.” (Appellant’s brief at p. 50.)
 

 “ ‘ “Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.” ’
 

 “Gaddy v. State,
 
 698 So.2d 1100, 1148 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.1997) (quoting
 
 Ex parte Siebert,
 
 555 So.2d 780, 783-84 (Ala.1989)). Furthermore, photographs that depict the crime scene are relevant and therefore admissible.
 
 Aultman v. State,
 
 621 So.2d 353 (Ala.Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993);
 
 Ex parte Siebert,
 
 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990);
 
 Hill v. State,
 
 516 So.2d 876 (Ala.Cr.App.1987). Finally, photographs may be admissible even if they are cumulative or demonstrate undisputed facts.
 
 Stanton v. State,
 
 648 So.2d 638 (Ala.Cr.App.1994);
 
 Hopkins v. State,
 
 429 So.2d 1146, 1157 (Ala.Cr.App.1983).”
 

 Hyde v. State,
 
 778 So.2d 199, 234-35 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).
 

 “ ‘[Pjhotographs depicting the character and location of wounds on a deceased’s body are admissible even though they are cumulative and are based on undisputed matters.
 
 Magwood [v. State],
 
 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986) ]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried.
 
 Id.
 
 Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury.
 
 Id.’
 

 “Ex parte Bankhead,
 
 585 So.2d 112 (Ala.1991). Accord,
 
 Ex parte Siebert,
 
 555 So.2d 780, 783-84 (Ala.1989), cert. denied, [497] U.S. [1032], 110 S.Ct. 3297,
 
 *1092
 
 111 L.Ed.2d 806 (1990);
 
 McElroy’s
 
 at § 207.01(2).”
 

 Parker v. State,
 
 587 So.2d 1072, 1092-93 (Ala.Crim.App.1991), opinion extended after remand, 610 So.2d 1171 (Ala.Crim.App.), aff'd, 610 So.2d 1181 (Ala.1992). Finally,
 

 “ ‘ “[p]hotographic evidence, if relevant, is admissible even if it has a tendency to inñame the minds of the jurors.”
 
 Ex parte Siebert,
 
 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble,
 
 McElroy’s Alabama Evidence,
 
 § 207.01(2) (4th ed.1991). “The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome.... ”
 
 Williams v. State,
 
 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).’
 

 “DeBruce v. State,
 
 651 So.2d 599, 607 (Ala.Cr.App.1993). See also
 
 Ex parte Bankhead,
 
 585 So.2d 112 (Ala.1991). The court did not
 
 err in
 
 allowing photographs of the victim’s body to be received into evidence.”
 

 Hutcherson v. State,
 
 677 So.2d 1174, 1200 (Ala.Crim.App.1994), rev’d on other grounds, 677 So.2d 1205 (Ala.1996).
 
 See also Giles v. State,
 
 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993);
 
 Haney v. State,
 
 603 So.2d 368 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992).
 

 We have reviewed the photographs, and we find that they were neither unduly prejudicial nor inflammatory. Rather, they were relevant to depict the injuries Steven suffered and made it possible for the jury to view them. Therefore, the trial court did not err in admitting them into evidence.
 

 VII.
 

 The appellant’s seventh argument is that the trial court should have granted a mistrial after the prosecutor allegedly commented, during his closing argument, on his failure to testify. Specifically, he challenges the following comment by the prosecutor:
 

 “Is it reasonable to believe that when Troy Connell himself has lied over and over and over about this case and not one time, not one time has he ever said that Mark Jones had anything to do with it?”
 

 (R. 750.)
 

 During his opening statement, defense counsel stated:
 

 “The State has told you what they expect the evidence to show. No one is going to stand here and tell you that there was not a horrid thing that happened that night. Certainly there was. But there are questions and issues about who did what. And I would submit to you, ladies and gentlemen, that you will hear evidence that there were four people in that vehicle that evening, earlier that evening. And that those four people were out, and they were drinking, and they were doing other things you might not particularly approve of. But that through most of that Troy Connell was passed out in the back seat of the vehicle, that he remained passed out in the back seat of the vehicle for an extended period of time and that sitting in the front seat were Lamar Killingsworth who was driving and Mark Jones who was riding in the front passenger seat. And I submit to you that there will be evidence that it was Mark Jones who was in that front passenger seat when that car went past Steven and Monica Spears, that it was Mark Jones who pulled that trigger and that it was Mark Jones who assaulted Monica Spears
 
 *1093
 
 while Lamar Killingsworth went around and got the wallet of Steven Spears out of his pocket.
 

 “I submit to you that there will be evidence that Troy Connell tried to stop Mark Jones. And at a point in time Mark pushed him as Mark was confronting Monica, that he pushed Troy and Troy fell back against the vehicle leaving a palm print there. I submit to you that Mark Jones shared in the proceeds, shared in the money that was taken in this case. But Mark Jones I submit to you the evidence will show found a way out of the most serious of these charges by pointing the blame at other people, people less able than he we would submit the evidence will show to defend themselves.
 

 “So I ask you as you start down this path to hear the evidence, please keep an open mind and wait until you hear all of the evidence before you make any kind of a decision. That’s what the law requires you to do because there is one other piece of evidence that is here with us now that is evidence and will continue to be evidence, and we talked about it earlier. And that is the presumption of innocence. Unless each and every one of you as you sit in that jury box at this moment views Troy Connell as not guilty in this case, then you are violating your oath as jurors. That is evidence in the case. As much as any evidence you will hear from the witness stand, any exhibits, it is evidence in this case. I submit to you that if you will keep an open mind until after you have heard all of the evidence, that there will be some serious questions in your mind as to who is where, what happened that night, and significant questions about the role and involvement of Mark Jones.”
 

 (R. 378-80.)
 

 During his closing argument, the prosecutor stated:
 

 “A couple of guys were doing drugs. They wanted some more, and they didn’t care who they killed. They didn’t care who they beat to have to get it, and that’s exactly what they did. There is no grand conspiracy. There is no fourth person in the back of the red SUV. There is no heroic attempt by that man to save Monica Spears. This is the price that Steven Spears had to pay. It’s the price that Monica Spears had to pay so that Troy Connell and his buddies could have five or six hundred dollars to do some more drugs. ...
 

 [[Image here]]
 

 “So what did happen? Monica thought that help had finally arrived. She walks back to the car in a panic trying to call 911, gets in the seat. Lamar and Troy get out. Are they going to help her? That’s what they wanted you to believe. Troy was there to save her. How does Troy decide that he is going to save Monica Spears? That was his idea. I am going to fight for her honor. I am going to stop someone from hurting her. He stopped her by taking a chain behind his back and beating her in the face for no reason other than to help his cousin, Lamar. Who goes to the other side of the car at the same time and does this? He yanks Steven out. He yanks Steven out, pulls his wallet, and the crime is complete. The prey is down; the money is taken. It’s time to go. Monica fights Troy, gets back out of the car. But at that point it doesn’t matter. There is nothing she can do. He and Lamar go back to the car.
 

 “Now what was it that Troy did? He fought valiantly to stop Mark Jones. That’s how his fingerprint got on the car, right, right there? No, of course not. ...
 

 
 *1094
 
 [[Image here]]
 

 “So let’s think about the lies that Troy Connell told. What did he tell Mark Jones? I am going to kill myself before I go to prison. Why would an innocent person say that? If Mark Jones killed Steven Spears and Troy Connell tried to stop it, why is he worried that he’s going to prison? Why instead doesn’t he go to police and tell them that Mark Jones did it? You know why. Every one of you knows why.
 

 “So what is the second lie? People start finding out. At this point it’s time to take action and blame it on somebody else. So Diane Pate, Troy’s own mom, takes Troy to see Johnny Tubbs sitting right here. They go to the police station voluntarily. They are going to tell the truth about what happened. Lie number two, Troy tells Johnny Tubbs Lamar took my car. And he and Rodney and Matt went off doing who knows what because we weren’t there. Me and Mark weren’t there. We were off at somebody else’s house. And then when they came back, Lamar told me they done killed somebody. Him and Rodney had killed somebody. And that’s what happened. Who is Rodney? Who is Matt?
 

 “Did Johnny Tubbs hear that story again that day? He sure did. When Diane Pate and Troy Connell go home, they tell Mark Jones, we need to see you. And standing over Mark Jones making sure that he tells the same lie as close as I am to you, they make Mark Jones tell the same lie. You heard Mark say why he lied. He saw Troy Connell shoot someone in the head. He saw Troy Connell beat someone in the face. He has seen the measures that Troy and his mom will go to keep Troy out of trouble. And he knows what measures that can get to. So he lied because he felt he had no other choice.
 

 “Lie number three, Jamie Lee, Troy’s own cousin. ... [WJhat did Troy tell Jamie Lee? Did he tell him that Matt, Rodney and Lamar did it? No. This time he says I was in the car, but I was just driving. Lamar did the shooting. Lamar did the beating and the stealing. I didn’t do nothing. What did he say Mark Jones did? Nothing. He didn’t say Mark Jones committed the murder. He didn’t say Mark Jones did the beating. He said Lamar did it. It all unraveled when Mark Jones without the assistance of Troy Connell, without the assistance of Troy Connell’s mom went to police and told them the truth.
 

 “Now on December 24th while they were in another city in a hotel days after they had taken the red SUV to a body shop, they are found and arrested. And this week Troy Connell’s attorneys have told you that he didn’t do it. They have told you that Mark Jones did it. He got out of the car. He beat Monica. He shot Steven Spears while Troy Connell was laid out in the back seat. But apparently Troy Connell wakes up just minutes later to be a hero for Monica. I think you know that’s not true either.
 

 [[Image here]]
 

 “Every piece of evidence in this case leads you to one conclusion. Troy Con-nell is guilty beyond a reasonable doubt of committing all four of these counts. And in about three minutes I’m going to sit down, and Mr. Connell’s attorneys are going to get up. And they are going to try to convince you that there is a reason, some reason to doubt that Troy Connell didn’t do one or all of these. You have heard what their story was on Tuesday. Mark Jones did it all. Troy Connell is a hero. He tried to save Monica Spears. Is it reasonable to think that Mark Jones shot Steven
 
 *1095
 
 Spears from the front seat of a car that he never sat in? Is it reasonable to think that Mark Jones was the person on the side of the Tahoe when the fingerprints show it was Troy Connell? Is it reasonable to think that Troy, that Mark Jones murdered Steven Spears and beat Monica Spears?
 
 Is it reasonable to believe that when Troy Connell himself has lied over and over and over about this case and not one time, not one time has he ever said that Mark Jones had anything to do with it?
 

 [[Image here]]
 

 “There is only one reasonable conclusion here, that’s that Troy Connell is guilty beyond any reasonable doubt of murdering Monica Spears’ husband, Steven, and then beating Monica in the face with a chain. That’s the only thing that is reasonable.”
 

 (R. 725-51.)
 

 . In denying the appellant’s motion for a mistrial, the trial court stated:
 

 “The Court finds that the context of the comment was regarding statements made by the Defendant outside of the courtroom on three or four different occasions during the investigation and did not necessarily reflect or was not a comment upon his inability to testify today or in the course of the last two or three days. So your motion for a mistrial will be denied.”
 

 (R. 791.)
 

 “ ‘[0]nce a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution.’
 
 Wherry v. State,
 
 402 So.2d 1130, 1133 (Ala.Cr.App.1981). ‘In determining if a prosecutorial remark impairs the integrity of the defendant’s right not to testify the test is whether the defense can show that the remark[, given the context in which it was made,] was intended to comment on the defendant’s silence or was of such character that a jury would naturally and necessarily construe it as a comment on the defendant’s silence.’
 
 United States v. LeQuire,
 
 943 F.2d 1554, 1565 (11th Cir.1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992).”
 

 Ex parte Davis,
 
 718 So.2d 1166, 1173 (Ala.1998). However,
 

 “ ‘[c]ounsel may comment on the failure of his adversary to produce evidence ... when the comment is pertinent to answer an argument made by opposing counsel.’
 
 Jarrell v. State,
 
 251 Ala. 50, 56, 36 So.2d 336, 341 (1948). The prosecutor has a right to comment on and answer statements made by defense counsel in argument to the jury.
 
 Dollar v. State,
 
 26 Ala.App. 361, 159 So. 704 (1935);
 
 Moragne v. State,
 
 16 Ala.App. 26, 28, 74 So. 862, 864, reversed on other grounds, 200 Ala. 689, 77 So. 322 (1917). Counsel should be afforded wide latitude in responding to assertions made by opposing counsel in previous argument.
 
 York v. State,
 
 34 Ala.App. 188, 190, 39 So.2d 694, 696 (1948), cert. denied, 252 Ala. 158, 39 So.2d 697 (1949). ‘Wide latitude is given the solicitor in making reply to argument previously made by appellant’s counsel.’
 
 Moody v. State,
 
 40 Ala.App. 373, 374, 113 So.2d 787, 788 (1959). ‘Wide latitude is given a district attorney in making reply in kind, ... and the propriety of argument of counsel is largely within the trial court’s discretion.’
 
 Jetton v. State,
 
 435 So.2d 167, 171 (Ala.Cr.App.1983).”
 

 Dossey v. State,
 
 489 So.2d 662, 665 (Ala.Crim.App.1986).
 

 “In reviewing allegedly improper prose-cutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to
 
 *1096
 
 view the allegedly improper acts in the abstract.
 
 Whitlow v. State,
 
 509 So.2d 252, 256 (Ala.Cr.App.1987);
 
 Wysinger v. State,
 
 448 So.2d 435, 438 (Ala.Cr.App.1983);
 
 Carpenter v. State, 404
 
 So.2d 89, 97 (Ala.Cr.App.1980),
 
 cert. denied,
 
 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.
 
 Orr v. State,
 
 462 So.2d 1013, 1016 (Ala.Cr.App.1984);
 
 Sanders v. State,
 
 426 So.2d 497, 509 (Ala.Cr.App.1982).”
 

 Bankhead v. State, 585
 
 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). Finally,
 

 “ ‘[djuring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’
 
 Rutledge v. State,
 
 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel.
 
 Racine v. State,
 
 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’
 
 Hooks v. State,
 
 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting
 
 Barnett v. State, 52
 
 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial,
 
 Duren v. State,
 
 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’
 
 Mitchell v. State, 480
 
 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’
 
 Twilley v. State,
 
 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).”
 

 Coral v. State,
 
 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).
 

 We have reviewed the complained-of comment in light of the entire trial, including the defense’s opening argument and the prosecutor’s closing argument. Viewed in that context, the prosecutor was obviously commenting on the appellant’s previous inconsistent statements and on the fact that the evidence did not support the representations defense counsel made in his opening argument. Moreover, the prosecutor’s comment was not “‘of such character that a jury would naturally and necessarily construe it as a comment on the defendant’s silence.’ ”
 
 Ex parte Davis,
 
 718 So.2d at 1173. Therefore, the appellant’s argument is without merit.
 

 For the above-stated reasons, we affirm the trial court’s judgment.
 

 AFFIRMED.
 

 McMILLAN and WISE, JJ., concur.
 

 SHAW and WELCH, JJ., concur in the result.
 

 [1]
 

 . The appellant raised additional arguments in his briefs and during oral arguments before this court. However, he did not first present those specific arguments to the trial court. "Specific grounds of objection waive all other grounds not specified at trial.”
 
 Smith v. State,
 
 602 So.2d 470, 472 (Ala.Crim.App.1992). Therefore, his additional arguments are not properly before this court. Moreover, many of the arguments the appellant and the
 
 *1077
 
 amicus curiae make involve policy decisions that are best left to the Alabama Legislature.